2019 IL App (1st) 170955

Nos. 1-17-0955, 1-17-0956, 1-17-0957 (cons.)

Fourth Division
March 21, 2019

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

|  |  |
|---|---|
| LOBO IV, LLC; THE DAVIS FAMILY TRUST; and MARC E. DAVIS,<br><br>    Plaintiffs and Counterdefendants-Appellants and Cross-Appellees,<br><br>v.<br><br>V LAND CHICAGO CANAL, LLC; V LAND BLOOMINGDALE ARMY TRAIL, LLC; V LAND MOKENA WOLF, LLC; and V LAND CORPORATION,<br><br>    Defendants-Appellees and Cross-Appellants<br><br>(Lakeside Bank,<br>    Intervenor-Defendant and Counterplaintiff-Appellee and Cross-Appellant). | Appeal from the Circuit Court of Cook County.<br><br>No. 05 CH 22194<br><br>The Honorable Franklin U. Valderrama, Judge Presiding. |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Reyes and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1      The instant consolidated appeals arise from a trial court order granting specific performance on two real estate purchase contracts between plaintiff Lobo IV, LLC (Lobo), and defendants (collectively, V Land), in which, after a bench trial, the trial court found that Lobo was entitled to purchase the properties pursuant to the contracts and was also entitled to

monetary damages due to V Land's failure to convey Lobo the properties under the terms of the contracts. However, in subsequent proceedings, the trial court also found that Lakeside Bank (Lakeside), an intervenor and counterplaintiff, had issued several mortgages on the properties that had priority over the purchase contracts and that Lobo's monetary judgment against V Land could be used to abate only the purchase price of the properties owed to V Land and would not abate any of the moneys due on the outstanding mortgages held by Lakeside, which the trial court found that Lobo would be required to pay off. All parties appealed.

¶ 2        Specifically, plaintiffs claim that (1) Lakeside's mortgages did not take priority over the purchase contracts, (2) the trial court should have permitted Lobo to abate any amounts owed to Lakeside to the extent of the judgment award in Lobo's favor, (3) the trial court should have extended the closing date further, (4) plaintiffs were entitled to additional attorney fees and to an updated damages award, and (5) the trial court should have appointed a receiver or escrowed the revenues from the properties at issue. Both V Land and Lakeside argue that Lobo terminated the purchase contracts by not closing on the date set by the trial court, and so plaintiffs' appeal should fail. Additionally, each raises their own issues on appeal. V Land claims that the trial court erred in granting specific performance and monetary damages. Lakeside claims that it was entitled to equitable subrogation on several loans it issued concerning the properties. For the reasons that follow, we affirm in part and reverse in part.

¶ 3                                          BACKGROUND

¶ 4        The underlying litigation in the instant case has been lengthy, spanning over 13 years since the purchase contracts at issue were first executed. As noted, the instant case proceeded to a bench trial; on appeal, none of the parties challenges any of the trial court's findings of

fact. Accordingly, we set forth the relevant factual background of the case as found by the trial court in its May 24, 2012, memorandum opinion and order following trial.

¶ 5        Plaintiff Lobo is an Illinois limited liability company (LLC), and plaintiffs the Davis Family Trust and Marc Davis are the members of Lobo. Lobo owned several parcels of land in Mokena, Illinois, and in June 2005, sold two of the Mokena properties to defendant V Land Mokena Wolf, an LLC owned and managed by Steve Panko, a real estate developer; as part of the same transaction, V Land agreed to sell to Lobo, at a later date, three other properties owned by other V Land entities in Chicago, Bloomingdale, and Streamwood.[1] The transaction was structured so that Lobo could take advantage of the tax-deferral provisions of § 1031 of the Internal Revenue Code (26 U.S.C. § 1031 (2000)) by utilizing the proceeds of the sale of its Mokena properties to purchase V Land's "exchange" properties. However, Lobo's purchase of V Land's properties never closed.

¶ 6        The properties at issue were owned by defendants V Land Chicago Canal, LLC, and V Land Bloomingdale Army Trail, LLC, and both properties were under construction at the time the parties entered into their agreements: the Chicago store (referred to as the Canal property due to its location) was under construction for a Staples office supply store and a Chase Bank branch, and the Bloomingdale store was under construction for another Staples store. The purchase contracts for both properties were identical in all material respects other than their price terms: the purchase price for the Canal property was $9.5 million and the purchase price for the Bloomingdale property was $4.2 million. Several provisions of the

---

[1]Only the Chicago and Bloomingdale properties are at issue on appeal. The record indicates that Lobo and V Land never entered into a contract for the Streamwood property and Lobo did not pursue any claims based on that property at trial.

purchase contracts are central to the issues on appeal, and we quote them where appropriate in our recitation of the facts and our analysis.[2]

¶ 7        First, paragraph 3 of the contracts contained a provision permitting an adjustment in the purchase price if an appraisal returned a different valuation for the property; according to the trial court's findings, this provision was included because the parties could not agree on a price, and Panko, owner of V Land, believed that the provision would work in his favor because he predicted that the appraisals would return higher valuations than the purchase prices set forth in the contracts. This provision provided:

> "*Purchase Price Adjustment.* No later than November 15, 2005, the parties shall obtain a duplicate original or certified copy of Permanent Lender's (as defined below) appraisal of the Property (which appraisal may assume completion of the Building, the Improvements and take the Leases with the Bank and Staples into consideration as fully open, operating and rent paying tenants, even if such assumption is considered an 'extraordinary assumption' by the appraiser, but shall not take this Agreement into consideration when determining appraised value) (the *'Appraised Value'*). In the event that the Appraised Value is greater or less than the Purchase Price, then Buyer may elect to no later than November 22, 2005 (i) terminate this Agreement and have the Earnest Money returned, be reimbursed for its Out-Of-Pocket Expenses (as defined below) and Buyer shall deliver the Third Party Reports (as defined below) to Seller or (ii) have the Purchase Price adjusted to equal the Appraised Value of the Property and Close. In the event Buyer fails to timely elect option (i) or (ii), Purchaser shall be deemed to have elected option (ii) above."

---

[2]We quote from the Chicago property's purchase contract; however, as noted, the material provisions of both contracts are identical other than the price terms.

¶ 8            Paragraph 8 of the contracts defined the term "Permanent Lender," which was used in paragraph 3:

> "*Permanent Loan.* Buyer's obligations are contingent upon Buyer, within ninety (90) days after the Effective Date, entering into a loan commitment (the *'Loan Commitment'*) with a lender (the *'Permanent Lender'*) prepared to provide permanent mortgage financing for the Property. The Loan Commitment shall provide for a non-recourse loan in an amount equal to 80% of the Purchase Price, at a rate of interest not to exceed 110-125 basis points over the 10-year treasury bill, with a loan term of 10 years amortized over 30 years with a loan fee not to exceed one-half of 1% (the *'Permanent Loan'*)."

¶ 9            Following execution of the agreements on June 30, 2005, Lobo applied for financing from Old Second National Bank (Old Second), which ordered appraisals on the two properties. The appraisals returned valuations that were lower than the contract prices: the appraised value of the Canal property was $8 million ($1.5 million below the contract price) and the appraised value of the Bloomingdale property was $4 million ($200,000 below the contract price). Old Second issued a loan commitment for the properties on November 9, 2005, at terms that were less favorable to Lobo than the terms set forth in the purchase agreement; specifically, Old Second's loan commitments required a personal guarantee from Marc Davis, a larger down payment, and a higher interest rate. Davis forwarded the appraisal summaries and the loan commitments to V Land on November 14, 2005, and indicated that he was confirming a closing for both properties on December 1, 2005, at the adjusted purchase prices.

¶ 10    On November 29, 2005, V Land's counsel notified Lobo that Lobo was in default under the purchase contracts because it had failed to obtain appraisals from a "Permanent Lender" as required under the contracts; V Land indicated that the loan commitments from Old Second did not comply with the parties' agreements because the terms differed from those set forth in the contracts. Instead of giving Lobo 30 days to cure the alleged default, as provided under the contracts, V Land's counsel informed Lobo that V Land was terminating the contracts and directing the release of earnest money held in escrow. In response, Lobo claimed that it was in compliance with the terms of the contracts because the financing contingency was for Lobo's benefit and Lobo had waived it by arranging for financing on less favorable terms. Therefore, Lobo claimed, Old Second's appraisals complied with the contracts. Lobo requested a closing date of December 15, 2005. When V Land did not close on the properties either on the original closing date of December 1, 2005, or the extended date of December 15, 2005, Lobo filed a lawsuit for specific performance and damages based on the failed closing. Lobo recorded *lis pendens* notices with respect to each property shortly thereafter.

¶ 11    In its answer and affirmative defenses, V Land raised several affirmative defenses to Lobo's complaint, including the allegation that Old Second did not qualify as a "Permanent Lender" under the parties' contracts and Lobo was therefore in default under the contracts. V Land alleged that Lobo had no actionable cause of action against V Land; that Lobo's claims were barred because Lobo failed to mitigate its alleged damages and by the doctrines of unclean hands, waiver, and estoppel; and that Lobo was not entitled to the relief requested. V Land also filed a counterclaim against Lobo, alleging breach of contract.

¶ 12    On August 18, 2008, Lobo filed a motion for the appointment of a receiver on the properties, claiming that discovery had revealed that there were a number of irregular and improper payments from the properties' operating accounts, including cash withdrawals and payment of legal fees. Lobo further claimed that it had discovered that V Land and Panko had placed additional debt on the properties through Lakeside after the commencement of the instant litigation and after the recordation of notices of *lis pendens* on the properties. On September 23, 2008, V Land filed a response in opposition to Lobo's motion to appoint a receiver, arguing that Lobo was not entitled to a receiver and that equity did not require the appointment of a receiver because any damages Lobo experienced were the result of its decision not to close on the properties. Attached to its response was the affidavit of Chris Sotos, the chief financial officer of V Land, in which he averred that, prior to the execution of the purchase contracts, V Land had obtained land acquisition and construction loans for each property. However, Sotos further averred that, in June 2006, V Land received additional financing on each property from Lakeside, which Sotos characterized as "mini-permanent loan[s]," that enabled V Land to pay off the prior loans. In its reply in support of the motion, Lobo argued that, under the purchase contracts, V Land was not entitled to take out new loans on the properties without Lobo's consent. On November 24, 2008, the trial court denied Lobo's motion to appoint a receiver, expressly finding that "[t]he court takes no position on the propriety of transfers."

¶ 13    On December 23, 2009, Lakeside filed a petition to intervene, in which it admitted that it had issued mortgages on the properties after the recordation of the *lis pendens* notices. On February 19, 2010, the trial court granted Lakeside's petition to intervene, and Lakeside filed an answer and affirmative defenses to Lobo's complaint, as well as counterclaims for

declarative relief, in which it sought findings that Lakeside's mortgages on the properties were valid mortgage liens and that Lakeside's interest in the properties was senior to Lobo's interest in the properties. Lakeside alleged that, at the time of execution of the purchase contracts, Lobo had actual and constructive notice that there were liens on the property and that Lakeside's subsequent loans were made with the intent of refinancing those prior loans. Accordingly, Lakeside claimed that, under the doctrines of conventional and equitable subrogation, it was entitled to hold the same lien priority as the prior lenders.

¶ 14    According to Lakeside's counterclaim, on March 8, 2005, CF Lender, L.L.C., made a loan to V Land in the original principal amount of $6,990,000 for purposes of constructing improvements on the Canal property, which was secured by a mortgage giving CF Lender, L.L.C., a first priority mortgage lien on the Canal property and all appurtenances to or improvements on the property. Later in 2005, the mortgage was assigned to Wrightwood Capital, LLC, which succeeded to all rights under the applicable loan documents.

¶ 15    Also according to Lakeside's counterclaim, on June 1, 2005, Keybank made a loan to V Land in the original principal amount of $3.5 million for purposes of constructing improvements on the Bloomingdale property, which was secured by a mortgage giving Keybank a first priority mortgage lien on the Bloomingdale property and all appurtenances to or improvements on the property.

¶ 16    According to Lakeside, both loans were set to mature in late 2006: the Canal mortgage on October 1, 2006, and the Bloomingdale mortgage on December 1, 2006. In order to avoid foreclosure on the loans, V Land requested that Lakeside refinance the loans; Lakeside agreed, provided that it obtained a first mortgage lien on each property. Lakeside agreed to make a first mortgage loan to V Land for $8 million, to be secured by a first mortgage lien

and assignment of rents in favor of Lakeside on the Canal property and agreed to make a first mortgage loan to V Land for $3.5 million, to be secured by a first mortgage lien and assignment of rents in favor of Lakeside on the Bloomingdale property. At the closing of the Canal loan on June 29, 2006, Lakeside disbursed $7,932,533.06, of which (1) $7,019,713.29 was paid directly to Wrightwood Capital to refinance the previous mortgage and (2) $518,464.06 was held in escrow to be used to pay for amounts already owed, or that might become due, for construction work at the property. At the closing of the Bloomingdale loan on June 29, 2006, Lakeside disbursed "at least" $3,474,418.76, and all of those funds were paid directly to Keybank to refinance the previous mortgage.

¶ 17    On June 11, 2010, Lobo filed a motion to dismiss Lakeside's counterclaim pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2008)), claiming that Lakeside's claims for conventional and equitable subrogation should be dismissed because Lakeside's loans were issued after Lobo had recorded *lis pendens* notices on the properties, meaning that Lakeside would be considered a "subsequent purchaser" under the *lis pendens* statute.

¶ 18    On July 9, 2010, Lakeside filed a motion for summary judgment on its counterclaim, claiming, *inter alia*, that it was expressly contemplated by the purchase contracts that the construction loans on the properties would be paid off at the closing in order for Lobo to take clear title to the properties, so denying subrogation would grant Lobo the unearned enrichment of ownership of the properties free of the existing mortgages. In response, Lobo claimed that the purchase contracts provided that V Land, not Lobo, would pay off any existing mortgages. Lobo's argument was based on paragraph 5 of the purchase contracts, which concerned title and provided:

"*Title Evidence.* Seller shall cause to be delivered to Buyer within fifteen (15) days after the Effective Date (a) a commitment dated on or after the Effective Date (the *'Title Commitment'*) to issue a 1992 ALTA form owner's policy of title insurance in the amount of the Purchase Price with those endorsements set forth below (the *'Title Policy'*) issued by Chicago Title Insurance Company (the *'Title Company'*), and (b) complete, legible copies of all documents relating to title exceptions referenced in the Title Commitment (the *'Title Documents'*). When issued, the Title Policy shall show title to the Property as of the Closing Date in Buyer to be subject only to the Permitted Encumbrances ***.

The proceeds due Seller at Closing shall be used by the Escrowee to satisfy or otherwise obtain a release of any existing mortgage including Lender's construction mortgage and any other monetary encumbrances arising from acts of Seller to enable the Title Company to delete the encumbrance from the Title Policy.

Buyer shall have ten (10) business days after receipt of the Title Commitment, Title Documents and the Existing Survey identified on *Exhibit 'D'* to object in writing (an *'Objections Letter'*) to any exceptions reported in the Title Commitment or any matters shown on the Existing Survey (such matters, *'Unpermitted Title and Survey Exceptions'*) and to request additional endorsements to address matters raised by the Title Commitment and Existing Survey. Matters specifically stated in the Title Commitment and not objected to by Buyer in the Objections Letter shall become permitted (*'Permitted Encumbrance'*).

Seller shall have 30 days from the date of the Objections Letter (the 'Cure Period') to have the Unpermitted Title and Survey Exceptions removed from the Title

Commitment, to correct the defects noted on the Existing Survey and to obtain a revised Title Commitment. If Seller does not have such exceptions removed, does not correct all survey defects and does not provide Buyer with a revised Title Commitment with the additional endorsements, if any, during the Cure Period, Buyer may elect, by written notice to Seller delivered within five (5) business days after the end of the Cure Period, to (i) terminate this Agreement, in which case the Earnest Money shall be returned to Buyer by Escrowee, the Out-Of-Pocket Expenses (as defined below) shall be reimbursed to Buyer, Buyer shall deliver the Third Party Reports (as defined below) to Seller, and the parties shall have no further rights or obligations hereunder, except for those rights and obligations which expressly survive any such termination, or (ii) waive such objections hereunder and proceed with the transaction pursuant to the remaining terms and conditions of this Agreement. Any objections to title which Buyer waives pursuant to (ii) above shall be deemed Permitted Encumbrances. If Buyer fails to give Seller notice of its election as provided above, it shall be deemed to have elected the option contained in subsection (ii) above. Notwithstanding anything to the contrary contained herein, if any existing mortgage or other monetary encumbrance is an exception to title and Seller fails to cure or satisfy such defect, then at Closing Buyer shall have the right to direct Escrowee to cause a portion of the Purchase Price to be used to satisfy the same."

¶ 19    On May 10, 2011, the trial court entered an order denying Lobo's motion to dismiss Lakeside's counterclaim and granting partial summary judgment in Lakeside's favor, finding that, based on conventional subrogation, Lakeside's mortgage on the Bloomingdale property was in first priority position and its mortgage on the Canal property was in first priority

position to the extent of $7,019,713.25. The court found that the issue of equitable subrogation of an additional $518,000 that Lakeside had lent on the Canal property could not be decided as a matter of law because there was insufficient evidence that the money was used to improve the property.

¶ 20    The matter proceeded to trial on the issues between Lobo and V Land[3] and, on May 24, 2012, the trial court entered a 20-page memorandum opinion and order. As noted, on appeal, the parties do not challenge any of the trial court's findings of fact and argue only about its interpretation of the contracts and the law. The trial court first noted that the parties stipulated that the terms of Old Second's loan commitment did not conform to the loan terms set forth in paragraph 8 of the contracts. Thus, the court found that the issues to be resolved were (1) whether the parties included paragraph 8 in the contracts for the benefit of Lobo or V Land, (2) if paragraph 8 served to protect solely the interests of Lobo, whether Lobo had the right to waive the loan commitment requirements in that paragraph, and (3) whether Lobo was ready, willing, and able to perform pursuant to the terms of the contracts in December 2005, thereby entitling it to specific performance.

¶ 21    The trial court rejected V Land's argument that paragraph 8 was included in the contracts for its protection, finding that

> "Panko is a sophisticated developer. By his own account, he has over his career bought and sold properties worth $300-400 million. The notion that in a negotiation in which the parties could not agree on price—the single most important term in any real estate transaction—he elected to protect V Land's interests via a provision relating to the type of loan the buyer would obtain defies logic. If Panko believed that

_____

[3]The issues concerning Lakeside were expressly not part of the trial.

only an appraisal from a lender willing to lend on the terms set forth in paragraph 8 would trigger the price adjustment provision of paragraph 3, it would have been a simple matter for paragraph 3 to so provide: 'No appraisal from a lender other than one issuing a loan commitment on the terms set forth in paragraph 8 will be sufficient to trigger a purchase price adjustment pursuant to this paragraph.' V Land could also have protected itself from unacceptably low valuations by negotiating a provision allowing the seller to cancel the contract if the Permanent Lender's appraisals resulted in values below specified dollar amounts. The absence of such common sense provisions strongly militates against the position V Land now takes and underscores the court's conclusion that V Land's arguments are nothing more than an after-the-fact effort to avoid the consequences of its failure to perform under the unambiguous terms of the agreements it entered into."

The trial court concluded that the financing contingency set forth in paragraph 8 was included solely for Lobo's benefit and, therefore, Lobo was permitted to waive it by accepting financing on less favorable terms. Furthermore, the court concluded that "[i]f Lobo was entitled to accept financing from a Permanent Lender on less favorable terms, it follows that Lobo was also entitled to use that lender's appraisals to invoke the price adjustment provisions of paragraph 3."

¶ 22    The court then considered whether Lobo was entitled to specific performance and found that it was. The court found that the evidence established that Lobo was ready, willing, and able to close on the properties as late as December 27, 2005, the last date it could close and receive the benefits of the § 1031 exchange. The court also found that the equities favored the grant of specific performance, finding that there was no wrongdoing by Lobo in its

13

selection of Old Second and the preparation of the appraisals. The court further found that V Land's conduct "precludes a finding that the remedy of specific performance would be inequitable under the circumstances presented here." The court noted that V Land received what it contracted for—namely, the Mokena properties—and so was not entitled to unreasonably withhold its own performance in conveying the exchange properties. However, the court found that V Land sought to pressure Lobo into paying more by commissioning its own appraisals, seeking out competing offers, and taking advantage of the fact that there was a limited time in which to close in an attempt "to extract prices for the properties not called for under any reasonable interpretation of the contracts." Accordingly, the trial court held that Lobo was entitled to specific performance of the contract for the Canal property at the price of $8 million and of the contract for the Bloomingdale property at the price of $4 million.

¶ 23    The trial court then considered whether Lobo was entitled to damages in addition to the grant of specific performance—specifically, damages stemming from the loss of the benefits of the § 1031 exchange and the loss of rental income from the properties during the period of time they were in V Land's possession. The court first looked to paragraph 16(b) of the contracts, which provided:

> "Should Seller default under this Agreement and provided that Buyer is not in default hereunder, Buyer shall give Seller written notice specifying the nature of the default. If Seller fails to cure such default within thirty (30) days after receipt of such notice, all Earnest Money shall be returned to Buyer, Buyer shall be entitled to its Out-Of-Pocket Expenses, provided the Third Party Reports are delivered to Seller and Buyer shall have the right to sue for specific performance."

The court found that "[t]he plain language of this clause does not provide that its remedies are exclusive or foreclose Lobo from seeking damages proximately caused by the delay in V [L]and's conveyance of the properties to Lobo." Additionally, the court found that limiting Lobo's relief to a grant of specific performance would "clearly" not make Lobo whole for the losses it sustained as a result of V Land's breach. The court found that Lobo's evidence established that it had incurred losses attributable to the failed § 1031 exchange in the amount of $2,020,321 and had incurred damages based on the loss of rental income in the amount of $3,991,433. Accordingly, the trial court held that Lobo was entitled to recover damages in the amount of $6,011,754 as a consequence of V Land's breach of the agreements; this amount was modified *nunc pro tunc* on August 14, 2012, to reflect an updated damages award of $6,367,650.

¶ 24     On August 10, 2012, Lobo filed a motion for abatement of the purchase price, arguing that damages awarded in the context of an award for specific performance are deemed equitable in nature and may offset the purchase price owed under the contracts.

¶ 25     On August 29, 2012, on a pretrial status date concerning the litigation between Lobo and Lakeside, it became clear that Lobo also wished to litigate issues concerning equitable abatement and Lakeside's alleged inequitable conduct. The trial court ordered Lobo to "file a pleading regarding equitable issues raised post-trial by plaintiff." On September 12, 2012, Lobo filed a complaint for declaratory judgment against Lakeside, alleging that the priority of any lien claimed by Lakeside was inferior to Lobo's rights to purchase the properties. Lobo alleged five counts: (1) count I, that Lakeside failed to properly reduce amounts due under its loans by continuously refinancing the properties and permitting the use of loan proceeds for property-related and other expenses; (2) count II, that any priority lien should be

reduced by the amounts not associated with the construction loans; (3) count III, that any obligation should first be satisfied by Lakeside and V Land looking to other sources, since the Lakeside loans were personally guaranteed by Panko and Lakeside had obtained title insurance covering any potential shortage due to amounts awarded to Lobo in the underlying litigation; (4) count IV, that Lobo held a superior position by virtue of the doctrine of equitable conversion; and (5) count V, that Lakeside had unclean hands due to its conduct. On October 3, 2012, Lakeside requested the trial court to strike counts II through V of Lobo's complaint as outside the scope of the trial court's August 29, 2012, order in an attempt to relitigate issues that had been previously decided. On November 6, 2012, the trial court struck counts III and IV of the complaint and struck most of count II, other than allegations concerning the $518,000 that was the subject of Lakeside's equitable subrogation claim.

¶ 26        On August 27, 2013, Lobo filed a motion to vacate or modify the trial court's May 10, 2011, order granting partial summary judgment in Lakeside's favor and finding that Lakeside's mortgages had priority over Lobo's interests in the properties. Lobo argued that the prior order was premature and erroneous as a matter of law. On February 3, 2014, the trial court denied Lobo's motion.

¶ 27        On March 11, 2014, Lakeside filed a motion for summary judgment on the remaining issues between Lakeside and Lobo, namely, on (1) count I of Lakeside's counterclaim, concerning $518,464.06 of Lakeside's loans that were used to pay contractors, and (2) counts I and V of Lobo's complaint, concerning equitable setoff of a portion of any amounts due to Lakeside based on Lobo's damages award in the underlying litigation against V Land.

¶ 28     On April 25, 2014, Lobo filed a motion to escrow excess revenues from the properties, arguing that the revenues from the properties had been improperly diverted to Panko and his related entities. On the same day, Lobo also filed a motion for an updated damages award and judgment, seeking damages for the loss of rental income between the date of the May 24, 2012, order and June 18, 2014, plus postjudgment interest, leading to a new damages award of $9,719,832. On April 28, 2014, Lobo also filed a petition for attorney fees and costs, as permitted under the purchase contracts.

¶ 29     On May 1, 2014, Lobo filed a cross-motion for summary judgment on the remaining issues between Lobo and Lakeside, arguing that it would be inequitable to permit Lakeside's liens to have priority over Lobo's interests in the properties because Lakeside issued its mortgages knowing that Lobo had filed suit against V Land and because Lakeside permitted V Land to divert its cash flow for purposes other than paying down its loans.

¶ 30     On February 6, 2015, V Land filed a motion to reconsider the award of damages granted by the trial court on May 24, 2012, and August 14, 2012, claiming that the trial court erred in granting Lobo damages because the contracts limited what damages could be recovered.

¶ 31     On February 25, 2015, the trial court issued a 27-page memorandum opinion and order, ruling on a number of outstanding motions and petitions: (1) Lobo's motion for summary judgment, (2) Lobo's motion to modify the judgment and abate the purchase price, (3) Lobo's petition for attorney fees, (4) Lobo's motion to update the damages award, (5) Lobo's motion to escrow excess revenues from the properties, and (6) Lakeside's motion for summary judgment.

¶ 32     With respect to the cross-motions for summary judgment, the trial court first considered whether Lakeside was entitled to equitable subrogation for the amounts that it had paid to the

contractors. The trial court found that the contractors and subcontractors who had contracted with V Land prior to the purchase contract established mechanics' liens on the properties at the time of contract for services. However, the court further found that all of the contractors and subcontractors, with the exception of one, had executed waivers of their rights to mechanics' liens prior to the time that Lakeside paid them. With respect to the one contractor that had not released its lien prior to Lakeside's payment, the trial court found that the mechanics' lien had not been perfected within four months after completion of the work. Accordingly, the trial court found that Lobo's interest was superior to Lakeside's interest with respect to the $518,000 that Lakeside had paid to the contractors.

¶ 33    The trial court next considered whether the amount Lobo owed to Lakeside should be reduced due to Lobo's damages award in the underlying litigation against V Land. The court noted that it would not be revisiting the prior decisions that Lakeside's interest in the original construction loans was superior to Lobo's interest in the properties and found that Lakeside's priority interest would only be reduced by the amount that Lakeside damaged Lobo in its handling of the loans. The trial court reviewed the reports of Lobo's and Lakeside's damages experts and determined that there were several questions of fact concerning whether Lakeside's management of the loans was inequitable, making summary judgment in Lobo's favor on the issue inappropriate.

¶ 34    The trial court next considered Lobo's motion to update the damages award to take into account lost rental income after the May 24, 2012, grant of specific performance. The court found that the initial damages award was intended to make Lobo whole in conjunction with the grant of specific performance. However, the trial court found that "[a]t this point, Lobo has no pending cause of action against V Land under which damages can be awarded" and

had not provided any authority for its claim of additional damages. Accordingly, the trial court denied Lobo's motion.

¶ 35    Next, the trial court considered Lobo's petition to abate the purchase price. The court first found that the petition was premature because the issue of attorney fees was outstanding. Next, the trial court found that Lobo's attempt to reargue Lakeside's priority based on conventional subrogation "cannot stand" and that "Lobo's petition to abate the purchase price is denied with prejudice to the extent that Lobo argues that 1) Lakeside is bound by the purchase agreements, 2) Lakeside is not entitled to conventional subrogation, 3) abatement is required by the *lis pendens* statute, or 4) that abatement is required against Lakeside because of Lobo's grant of specific performance." The court further noted that even if Lobo prevailed on its claims that Lakeside behaved inequitably in servicing its loans, the purchase price would only be reduced by the damages awarded against Lakeside. Finally, the court noted that even if the purchase price was abated in the full amount requested by Lobo, Lobo would still not receive clear title to the properties because Lakeside's liens would still need to be satisfied. In sum, the trial court denied the petition to abate the purchase price with respect to Lakeside's right to conventional subrogation, and entered and continued the remainder of the petition pending a final determination of amounts owed by V Land and resolution of Lobo's complaint against Lakeside.

¶ 36    The trial court next considered Lobo's petition for attorney fees. With respect to the issues on appeal, the trial court denied Lobo's petition concerning any of the posttrial litigation between Lobo and Lakeside. Lobo claimed that it was entitled to such fees under paragraph 31 of the contracts, which provided:

"In the event of litigation arising out of this Agreement, the prevailing party shall be entitled to court costs, out-of-pocket expenses and reasonable attorneys' fees from the unsuccessful party."

The court found that Lakeside prevailed on its motion for summary judgment, based on conventional subrogation, so Lobo would not be entitled to attorney fees on that issue. With respect to the issue of subrogation of the mechanics' liens, the court found that Lobo had prevailed on that issue, but that Lobo had not demonstrated that the litigation "[arose] out of" the purchase contracts. Instead, the court found that Lobo's claim for attorney fees incurred while litigating the issue "arises independently of its specific performance claim against V Land." The court reached a similar conclusion with respect to Lakeside's allegedly inequitable conduct in the management of its loans, further finding that there was no "prevailing party" because that issue was still pending.

¶ 37        Finally, the trial court considered Lobo's motion to escrow the excess income from the properties. The court found that there was no pending claim against V Land and that "[w]ithout a cause of action, Lobo is not entitled to a judgment; without the possibility of a judgment, Lobo is not entitled to an attachment order." The trial court further found that Lobo's original complaint against V Land did not allege a cause of action for fraud against V Land. Accordingly, the trial court denied Lobo's request to escrow the excess revenue from the properties.

¶ 38        On April 2, 2015, V Land filed a "petition to declare judgment satisfied," claiming that nearly three years had passed since the grant of specific performance, yet Lobo had not yet purchased the properties. V Land thus claimed that *laches* should operate to bar Lobo from obtaining specific performance.

¶ 39        On May 13, 2015, Lobo filed a motion to set hearing dates to resolve all remaining claims and to schedule the closing for the purchase of the properties.

¶ 40        On September 21, 2015, the trial court entered an order in which it, *inter alia*, (1) denied V Land's petition to declare the judgment satisfied, (2) denied Lobo's motion to set a hearing date or closing date, and (3) dismissed, *sua sponte*, counts I and V of Lobo's complaint against Lakeside without prejudice and with leave to amend. With respect to counts I and V, the trial court found that, having reviewed the pleadings, "neither of these counts asks the Court to inform the parties on how to conduct future performance or conduct, but rather talks about past conduct and wants this *** Court to make a decree *** regarding nonliability or alleged nonliability for past acts. That is not the purpose of a declaratory complaint."

¶ 41        On October 27, 2015, Lobo filed an amended complaint against Lakeside, amending only the prayers for relief on counts I and V. Also on October 27, 2015, the trial court entered a memorandum opinion and order on the issue of attorney fees, in which the trial court declined to reconsider its ruling on Lobo's request for fees in connection with the litigation between Lobo and Lakeside.

¶ 42        On December 29, 2015, Lakeside filed a motion for judgment on the pleadings pursuant to section 2-615(e) of the Code (735 ILCS 5/2-615(e) (West 2014)), claiming that counts I and V of the amended complaint failed to state causes of action. On January 19, 2016, Lobo filed a motion to reconsider the September 21, 2015, *sua sponte* dismissal of counts I and V of its complaint against Lakeside. On April 20, 2016, the trial court entered a 23-page memorandum opinion and order denying Lobo's motion to reconsider and granting Lakeside's motion for judgment on the pleadings. After a recitation of the lengthy procedural posture of the instant case, the trial court first found that Lobo had waived any objection to

the court's *sua sponte* dismissal of counts I and V of the complaint by filing an amended complaint. However, the court also noted that the sufficiency of counts I and V of the amended complaint (which were substantively identical to the original counts I and V) were nevertheless at issue through Lakeside's motion for judgment on the pleadings.

¶ 43    The court found that counts I and V of Lobo's amended complaint against Lakeside were not proper actions for declaratory judgment because the allegations upon which Lobo's requested relief was based included only past conduct by Lakeside and, thus, the counts "do not further the central purpose of an action for declaratory judgment to offer guidance to the parties in relation to future conduct in order to avoid or lessen potential liability because the acts upon which Counts I and V are predicated have already occurred." Additionally, the trial court found that Lobo was not entitled to any relief because "neither count is properly based upon any substantive legal theory recognized by Illinois law." The court noted that Lobo referred to "inequitable conduct" but found that " 'inequitable conduct' is not an independent substantive legal theory that is recognized by Illinois law." Moreover, the court found that even if it was a proper basis for a declaratory judgment action, Lobo's attempt to use the doctrine of unclean hands under the present facts contained "several fatal flaws."

¶ 44    The court first found that the allegations of Lakeside's inequitable conduct did not pertain to the transaction at issue—Lakeside's loans to V Land—but pertained only to actions allegedly taken by Lakeside after it had issued the loans. Additionally, the court found that Lobo had cited no authority for the proposition that Lakeside owed a duty to Lobo to require V Land to use all income from the properties to pay down the principal balance of Lakeside's loans. Finally, "and on a most fundamental level," the court found that counts I and V were essentially an attempt to relitigate Lakeside's claims for conventional subrogation.

22

Accordingly, the trial court granted Lakeside's motion for judgment on the pleadings on counts I and V of the amended complaint against Lakeside.

¶ 45     On May 24, 2016, Lobo filed a petition to determine the priority payoff amounts for Lakeside's mortgages. On September 27, 2016, the trial court entered a 19-page memorandum opinion and order concerning Lobo's petition for abatement and its petition to determine the priority payoff amounts. The court found that the amount of Lakeside's first priority mortgage liens on the properties could be no more than the remaining principal balance of the loans, with upper limits of $7,019,713.29 on the Canal loan and $3,570,391.71 on the Bloomingdale loan. To the extent those principal balances had been reduced, the amount required to satisfy the priority mortgage lien was likewise reduced. With respect to the Bloomingdale lien, the court found the calculation to be straightforward—Lakeside's first priority mortgage lien on the property would be satisfied by the payment of the outstanding principal balance of the loan at any given point in time.

¶ 46     However, the court found that the Canal loan presented a more complex scenario because the amounts initially advanced by Lakeside exceeded the amount required to satisfy the prior mortgage and Lakeside had a priority interest only on the $7,019,713.29 required to discharge that prior mortgage; the remaining $1,079,573.86 was inferior to Lobo's interest in the property. Thus, the court had to determine how to allocate any payments made on the Canal loan between the portion that had priority and the portion that was inferior to Lobo's interest. The trial court found that the payments should be applied *pro rata* to each loan and that the amount required to satisfy Lakeside's first priority lien on the Canal property was 86.67% of the outstanding balance of the loan.

¶ 47    With respect to the issue of abatement, the trial court found that there was no real dispute that Lobo was entitled to abate the purchase price, at least to the extent of Lakeside's first priority liens on the properties, and found abatement of the $8 million purchase price for the Canal property by $980,286.71 and abatement of the $4 million purchase price for the Bloomingdale property by $429,608.29. Under this calculation, the trial court found that the purchase price of the properties would equal the amount of Lakeside's first priority mortgage liens on the properties—$7,019,713.29 on the Canal property and $3,570,391.71 on the Bloomingdale property—and the award of equitable compensation to Lobo would be reduced to $4,957,755. Additionally, further abatement was warranted to the extent that the amounts needed to satisfy Lakeside's first priority mortgage liens on the properties were less than the total amount of the liens. The court thus indicated that it would set a closing date for performance of the agreements and ordered that, after that date was set, Lakeside was to file a memorandum to specify the amounts required to satisfy the first priority liens on the properties as of the closing date. Lobo would then need to tender to V Land or Lakeside at the closing the amounts required to satisfy Lakeside's first priority mortgage liens on the properties and V Land would tender to Lobo deeds to the properties free and clear of Lakeside's first priority mortgage liens.

¶ 48    On October 11, 2016, Lakeside filed a motion to modify the trial court's order, claiming that it was entitled to equitable subrogation of amounts that Lakeside had advanced to pay property taxes and amounts on the Bloomingdale loan that had been used to pay off the Canal construction loan.

¶ 49 On October 14, 2016, the trial court entered an order, setting a closing date of January 12, 2017; the closing date was later rescheduled to March 23, 2017. On March 9, 2017, the trial court denied Lakeside's motion to modify the September 27, 2016, order.

¶ 50 On March 17, 2017, the trial court entered a final modified judgment, in which it ordered that on March 23, 2017, "in accordance with [the] Purchase and Sale Agreement," V Land was to sell to Lobo the Canal property for the purchase price of $8 million, payable as follows: (1) Lobo was to pay Lakeside $6,110,302.49 on the Canal loan; (2) upon Lakeside's receipt of the payment, Lakeside was to deliver to Lobo a release of the first and second mortgages, including all modifications, held by Lakeside on the Canal property, a release of the assignment of rents on the Canal property, and a UCC termination statement for the security agreement, all in recordable form, and V Land was to deliver to Lobo a special warranty deed to the Canal property in recordable form; and (3) the balance of the purchase price in the amount of $1,889,697.51 was to be abated by application of amounts due from V Land to Lobo.

¶ 51 Additionally, the court ordered that on March 23, 2017, "in accordance with [the] Purchase and Sale Agreement," V Land was to sell to Lobo the Bloomingdale property for the purchase price of $4 million, payable as follows: (1) Lobo was to pay Lakeside $3,041,467.24 on the Bloomingdale loan; (2) upon Lakeside's receipt of the payment, Lakeside was to deliver to Lobo a release of the first and second mortgages, including all modifications, held by Lakeside on the Bloomingdale property, a release of the assignment of rents on the Bloomingdale property, and a UCC termination statement for the security agreement, all in recordable form, and V Land was to deliver to Lobo a special warranty deed to the Bloomingdale property in recordable form; and (3) the balance of the purchase price in

the amount of $958,532.76 was to be abated by application of amounts due from V Land to Lobo.

¶ 52     The trial court further ordered that "[s]ubject to the provisions above, the closing of both the above purchase and sale transactions shall be conducted according to the terms of the respective Canal Contract and Bloomingdale Contract (together the 'Contracts'), including without limitation those provisions of the Contracts requiring execution and/or delivery of documents at closing and allocation and/or payment of closing costs, prorations, and credits."

¶ 53     The court found that, after application of the abatements set forth earlier in the order, the unabated amount due to Lobo from V Land was $7,205,697.43, including statutory interest through March 17, 2017, and entered judgment in Lobo's favor and against V Land in that amount.

¶ 54     On March 23, 2017, Lobo filed an emergency motion to enforce the final modified judgment, in which it claimed that V Land was violating the judgment. Lobo claimed that V Land was violating paragraph 5 of the contracts, which required V Land to deliver a title policy that, when issued, "shall show title to the Property as of the Closing Date in Buyer subject only to the Permitted Encumbrances." Lobo claimed that on March 22, 2017, Chicago Title Insurance Company (Chicago Title) delivered *pro forma* title policies for both properties that complied with paragraph 5 of the contracts. However, later in the day, Chicago Title informed Lobo that it planned to add new "exceptions" to the title policies, excluding coverage for possible claims by Lakeside and V Land. Additionally, at 10:44 a.m. on March 23, Chicago Title delivered "revised" *pro forma* title policies, which added five new exceptions to the Canal title policy and four new exceptions to the Bloomingdale title policy, none of which were "Permitted Encumbrances" allowed under the contracts. Lobo

claimed that the newly added exceptions included exceptions for (1) Lakeside's mortgages, (2) Lakeside's assignments of leases and rents, and (3) the instant "[p]roceeding" as reflected in the various orders and judgments entered in the case. Lobo demanded that V Land comply with its obligations and the judgment and deliver clean title policies, but V Land failed to do so, and Lobo claimed that there was "no indication" that V Land intended to comply with Lobo's requests. Lobo further claimed that V Land had violated paragraph 12(v) of the contracts, which required it to deliver all documents that were required to close the transaction and issue the title policy. Lobo claimed that both Lobo and its lender had made it clear that they required clean title policies at closing, and V Land failed to deliver such documents, as well as failing to deliver a number of other documents. Finally, Lobo claimed that V Land had violated the portion of the judgment and contracts that required V Land to pay its share of the closing costs, which V Land's counsel informed Lobo that it would not do.

¶ 55    Lobo claimed that it was ready, willing, and able to close on the purchase of both properties and requested that the trial court set a new closing date and order V Land to immediately deliver conforming title policies, pay the closing costs as required, and deliver all other documents required under the contracts. In the alternative, if V Land was unwilling to comply with the court's judgment and the contracts, Lobo requested that the court provide additional relief to Lobo, including using its authority to execute judicial deeds to convey the properties to Lobo. Lobo requested that, in the alternative, the court should, at a minimum, appoint a receiver for the properties with directions to pay all excess rents to Lobo.

¶ 56    Attached to Lobo's emergency motion were the *pro forma* title policies referred to in its motion, which included exceptions for the Lakeside mortgages, the assignment of leases and

27

rents, the "[p]roceeding pending in the Circuit Court of Cook County, Illinois, as case number 05 CH 22194," and the "[t]erms and provisions contained in [the] Memorandum Opinion and Order entered on May 24, 2012" in the instant case.

¶ 57     In response, Lakeside and V Land both claimed that the exceptions on the title policies were required by Chicago Title in order to protect against any appeals in the instant litigation. They further claimed that, under the contracts, Lobo had the choice of either terminating the agreement or waiving any unpermitted encumbrances and closing. Thus, since Lobo had not closed on March 23, it should be deemed to have terminated the agreements.

¶ 58     On March 27, 2017, the trial court denied Lobo's emergency motion, agreeing with Lakeside and V Land with respect to the arguments set forth in their responses. Lobo, V Land, and Lakeside each filed notices of appeal, and the three appeals were consolidated on August 2, 2017.

¶ 59                                    ANALYSIS

¶ 60     On appeal, the three parties raise a number of arguments, challenging nearly every substantive order entered in this case. Specifically, plaintiffs claim that (1) Lakeside's mortgages did not take priority over the purchase contracts, (2) the trial court should have permitted Lobo to abate any amounts owed to Lakeside to the extent of the judgment award in Lobo's favor, (3) the trial court should have extended the closing date further, (4) plaintiffs were entitled to additional attorney fees and to an updated damages award, and (5) the trial court should have appointed a receiver or escrowed the revenues from the properties at issue. Both V Land and Lakeside argue that Lobo terminated the purchase contracts by not closing on the date set by the trial court, and so plaintiffs' appeal should fail. Additionally, each raises its own issues on appeal. V Land claims that the trial court erred in granting specific

performance and in granting Lobo monetary damages in addition to specific performance, while Lakeside claims that it should have been entitled to equitable subrogation on several other loans it issued concerning the properties. We consider the major issues in the following order: (1) whether Lobo was entitled to specific performance, (2) if it was, whether that right terminated when Lobo did not close on March 23, 2017, (3) if it did not, whether Lakeside's mortgages had priority over Lobo's interest in the properties, and (4) if they did, whether Lobo was required to pay the full outstanding balance of each mortgage at closing. The other issues raised by the parties will be discussed within the context of this framework.

¶ 61                                   I. Specific Performance

¶ 62        The first issue we consider is whether Lobo was entitled to specific performance on the purchase contracts and the related issue of whether Lobo was also entitled to monetary damages in addition to the grant of specific performance. These issues were resolved in Lobo's favor on May 24, 2012, after a bench trial. In a bench trial, the trial court has the opportunity to weigh the evidence and make findings of fact, and a reviewing court will defer to the findings of the trial court unless they are against the manifest weight of the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner*, 202 Ill. 2d at 252. " 'The court on review must not substitute its judgment for that of the trier of fact.' " *Eychaner*, 202 Ill. 2d at 252 (quoting *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 434 (1991)). However, in the case at bar, the trial court also construed and ruled on the legal effect of documents. In reviewing these conclusions of law, we apply a *de novo* standard of review.

*Eychaner*, 202 Ill. 2d at 252. *De novo* consideration means we perform the same analysis that a trial judge would perform. *People v. McDonald*, 2016 IL 118882, ¶ 32.

¶ 63                                    A. Grant of Specific Performance

¶ 64      To state a cause of action for specific performance, a plaintiff must allege (1) the existence of a valid, binding, and enforceable contract; (2) compliance by the plaintiff with the terms of the contract, or proof that the plaintiff was ready, willing, and able to perform the terms of the contract; and (3) the failure or refusal of the defendant to perform its part of the contract. *Schilling v. Stahl*, 395 Ill. App. 3d 882, 884 (2009); *Hoxha v. La Salle National Bank*, 365 Ill. App. 3d 80, 85 (2006). "In order for a party to be entitled to specific performance, the contract must be so certain and unambiguous in its terms and in all its parts that a court can require the specific thing contracted for to be done." *Schilling*, 395 Ill. App. 3d at 884-85 (citing *Cefalu v. Breznik*, 15 Ill. 2d 168, 170 (1958)). Specific performance is generally not available as a matter of right; "the remedy rests in the sound discretion of the trial court, based on all of the facts and circumstances in evidence." *Daniels v. Anderson*, 162 Ill. 2d 47, 56 (1994).

¶ 65      In the case at bar, V Land argues that the trial court erred in finding that Lobo was entitled to specific performance because Lobo violated the contracts by reducing the purchase price for the properties without obtaining appraisals from a "Permanent Lender." This argument requires us to look to the language of the contracts at issue. The principal objective in construing a contract is to determine and give effect to the intention of the parties at the time they entered into the contract. *Fleet Business Credit, LLC v. Enterasys Networks, Inc.*, 352 Ill. App. 3d 456, 469 (2004). " '[A]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the

30

intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.' " *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999) (quoting *Western Illinois Oil Co. v. Thompson*, 26 Ill. 2d 287, 291 (1962)). A court interpreting a contract begins by examining the language of the contract alone, and "[i]f the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." *Air Safety*, 185 Ill. 2d at 462 (citing *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447 (1991)).

¶ 66    "In interpreting a contract, it is presumed that all provisions were intended for a purpose, and conflicting provisions will be reconciled if possible so as to give effect to all of the contract's provisions." *Shorr Paper Products, Inc. v. Aurora Elevator, Inc.*, 198 Ill. App. 3d 9, 13 (1990). "A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used. [Citation.] Further, when parties agree to and insert language into a contract, it is presumed that it was done purposefully, so that the language employed is to be given effect. [Citation.]" *Thompson v. Gordon*, 241 Ill. 2d 428, 442 (2011).

¶ 67    In the case at bar, paragraph 3 of the contracts contained a provision permitting an adjustment in the purchase price if an appraisal returned a different valuation for the property. It provided:

> "*Purchase Price Adjustment.* No later than November 15, 2005, the parties shall obtain a duplicate original or certified copy of Permanent Lender's (as defined below) appraisal of the Property (which appraisal may assume completion of the Building, the Improvements and take the Leases with the Bank and Staples into consideration as fully open, operating and rent paying tenants, even if such assumption is

considered an 'extraordinary assumption' by the appraiser, but shall not take this Agreement into consideration when determining appraised value) (the *'Appraised Value'*). In the event that the Appraised Value is greater or less than the Purchase Price, then Buyer may elect to no later than November 22, 2005 (i) terminate this Agreement and have the Earnest Money returned, be reimbursed for its Out-Of-Pocket Expenses (as defined below) and Buyer shall deliver the Third Party Reports (as defined below) to Seller or (ii) have the Purchase Price adjusted to equal the Appraised Value of the Property and Close. In the event Buyer fails to timely elect option (i) or (ii), Purchaser shall be deemed to have elected option (ii) above."

Paragraph 8 of the contracts defined the term "Permanent Lender," which was used in paragraph 3:

"*Permanent Loan.* Buyer's obligations are contingent upon Buyer, within ninety (90) days after the Effective Date, entering into a loan commitment (the *'Loan Commitment'*) with a lender (the *'Permanent Lender'*) prepared to provide permanent mortgage financing for the Property. The Loan Commitment shall provide for a non-recourse loan in an amount equal to 80% of the Purchase Price, at a rate of interest not to exceed 110-125 basis points over the 10-year treasury bill, with a loan term of 10 years amortized over 30 years with a loan fee not to exceed one-half of 1% (the *'Permanent Loan'*). ***"

V Land argues that Old Second, Lobo's lender, did not qualify as a "Permanent Lender" and, therefore, the appraisal it commissioned was not a proper basis for reduction of the purchase price. We do not find this argument persuasive.

¶ 68    V Land interprets the language of paragraph 8 of the contracts to mean that a "Permanent Lender" is defined as a lender that enters into a loan commitment with the buyer under the terms as set forth in paragraph 8. However, the language of paragraph 8 does not require such a narrow interpretation. Examining the language of the contracts as a whole, the contracts define a great number of terms in the same way as in paragraphs 3 and 8, namely, by setting forth a description of an item or party, followed by a shorthand term for the item or party contained within parentheses and quotation marks. As a basic example of this type of shorthand, the first recital in the Canal contract provides: "Seller is the owner of a parcel of land containing approximately 1.14 acres located at 1130 South Canal Street in Chicago, Illinois (the *'City'*) which is legally described on *Exhibit 'A'* attached hereto and incorporated herein (the *'Land'*)." "City" and "Land" are clearly used as shorthand for the places immediately preceding the defined terms. See *Berg v. eHome Credit Corp.*, 848 F. Supp. 2d 841, 846 (N.D. Ill. 2012) (interpreting the term "Borrower," which appeared in quotation marks and parentheses after the parties' names, to be a shorthand for the parties' names elsewhere in the agreement). Where the contracts define terms in other ways, they do so expressly. For instance, in defining the term "Out-Of-Pocket Expenses" in paragraph 5, the contracts expressly note that "[a]s used herein, the term *'Out-Of-Pocket Expenses'* includes," followed by the items included in the definition of the term.

¶ 69    Looking to the terms of paragraph 8, it states that the buyer's obligations are contingent upon its entering into a loan commitment "with a lender (the *'Permanent Lender'*) prepared to provide permanent mortgage financing for the Property." Thus, a "Permanent Lender" is simply a defined name for "a lender." At most, the definition could arguably be expanded to include one prepared to provide permanent mortgage financing for the property. The

33

requirements that follow specify the terms that are required to be contained in the loan commitment, but do not appear to limit whether the lender itself is considered to be a "Permanent Lender." Indeed, the financing terms come immediately prior to the defined term "Permanent Loan," indicating that the terms restrict only what is considered a "Permanent Loan." Thus, we cannot agree with V Land that Old Second did not qualify as a "Permanent Lender" under the terms of the contracts merely because its loan commitment contained different financing terms.

¶ 70    Furthermore, even if the terms of the mortgage affected whether a lender was a "Permanent Lender," we agree with the trial court that Lobo was entitled to waive such restrictions because the condition was solely for its benefit. A mortgage contingency clause is considered to be a condition precedent and, where a contract contains a condition precedent, the contract is not enforceable or effective until the condition is performed or the contingency occurs. *Perry v. Estate of Carpenter*, 396 Ill. App. 3d 77, 82 (2009). However, " 'a party to a contract may waive performance of a condition precedent *** where the condition precedent is intended for the benefit of the waiving party.' " *Perry*, 396 Ill. App. 3d at 82 (quoting *Catholic Charities of the Archdiocese of Chicago v. Thorpe*, 318 Ill. App. 3d 304, 309 (2000)). Mortgage contingency clauses have been interpreted to be for the benefit of the purchaser. See, *e.g.*, *Perry*, 396 Ill. App. 3d at 82; *Barnes v. Brown*, 193 Ill. App. 3d 604, 607-08 (1990).

¶ 71    In the case at bar, V Land does not challenge the trial court's factual finding that the financing contingency set forth in paragraph 8 was intended for Lobo's benefit, which was made after hearing a great deal of testimony and considering the evidence. Instead, V Land claims that the trial court's error was in overlooking paragraph 29 of the contracts, which

provided that each contract "may be modified or amended only by written instrument signed by both parties." We do not find this argument persuasive.

¶ 72    First, V Land did not raise this argument before the trial court. It is well established that issues not raised in the trial court are forfeited and may not be raised for the first time on appeal. *Susman v. North Star Trust Co.*, 2015 IL App (1st) 142789, ¶ 41. Accordingly, V Land has forfeited this argument on appeal. Moreover, even on its merits, paragraph 29 did not prevent Lobo from unilaterally waiving the financing condition. The waiver of a provision by the party for whose benefit the provision was inserted "is held not to be a modification or change in the terms of the original agreement." *Welsh v. Jakstas*, 401 Ill. 288, 298-99 (1948). Thus, Lobo's waiver of the financing contingency did not operate to modify or amend the contracts. The case relied on by V Land, *Reed v. Getco, LLC*, 2016 IL App (1st) 151801, ¶¶ 21-22, is entirely inapposite because that case involved a provision that expressly prohibited unilateral waivers in addition to modifications, which is not the case with paragraph 29. Accordingly, even if it had not been forfeited, we find no merit to V Land's arguments concerning paragraph 29.

¶ 73    V Land also argues that the trial court's analysis was flawed because it failed to construe both paragraph 3 and 8 in conjunction. We do not find this argument persuasive. The trial court expressly considered both paragraphs 3 and 8 in determining whether Lobo was entitled to waive the financing contingency. Additionally, despite V Land's contentions to the contrary, it was the interpretation of paragraph 8 that was crucial in determining whether Lobo was entitled to an adjustment of the purchase price. Paragraph 3 is simple in its effect: the parties were to "obtain a duplicate original or certified copy of Permanent Lender's *** appraisal of the Property ***." If the appraised value was different than the purchase price,

the buyer was entitled to an adjustment in the price or to terminate the contract. The operative language that needed to be interpreted was whether the appraisal submitted in the instant case was commissioned by a "Permanent Lender." That is the analysis engaged in by the trial court. It concluded that the financing contingency included in paragraph 8 could be unilaterally waived by Lobo and further concluded that the purchase price was entitled to adjustment on the basis of Old Second's appraisal. This necessarily meant that the trial court found Old Second to be a "Permanent Lender." As we have explained above, we agree with this conclusion.

¶ 74        V Land attempts to muddy the waters by arguing that the trial court needed to determine that *paragraph 3* was also intended solely for Lobo's benefit in order for Lobo to be entitled to adjust the purchase price. However, that is not the case. The definition of "Permanent Lender" is contained in paragraph 8. The trial court found, and we agree, that Old Second satisfied this definition—either by the express terms of the paragraph or because the restrictions on the term were properly waived by Lobo. The term "Permanent Lender" is also *used* in paragraph 3, but is not *defined* in paragraph 3. Upon finding that Old Second satisfied the definition of "Permanent Lender," it follows that its appraisal would be the appraisal of a "Permanent Lender." Such an appraisal would, by the express terms of paragraph 3, permit the adjustment of the purchase price. There is no need to determine that the provision was included for any particular party's benefit to reach this conclusion.

¶ 75        Finally, V Land argues that the trial court erred in permitting adjustment of the purchase price because the appraisal itself was flawed and did not appraise the "Property" as defined in the contracts because it did not properly take into account the leases on the properties. We do not find this argument persuasive. First, as the trial court found, despite errors in the

appraisal itself, there is no evidence that the appraiser did not properly appraise the "Property," as the appraiser did take into account the leases. Second, the terms of the contracts do not contain any mechanism by which V Land could challenge the validity of the appraisal submitted by the "Permanent Lender," and paragraph 3 does not condition adjustment of the purchase price on V Land's acceptance of the values returned by the appraisal. Accordingly, we see no basis for finding that the challenges to the contents of the appraisal itself would preclude adjustment of the purchase price. As the trial court found, Panko and V Land were sophisticated sellers, and if they had wished to use a different mechanism to calculate the value of the properties, they certainly could have done so. Consequently, we affirm the trial court's grant of specific performance at the lower purchase prices.

¶ 76                           B. Grant of Monetary Damages

¶ 77        Next, V Land challenges the trial court's award of monetary damages in connection with the grant of specific performance. "The decision to award or deny monetary damages in addition to specific performance rests within the sound discretion of the trial court." *Mandel v. Hernandez*, 404 Ill. App. 3d 701, 705 (2010). When a decree of specific performance does not provide complete relief, "the injured party is entitled to those damages that will make him whole, including monetary damages incidental to and caused by a delay in performance." *Mandel*, 404 Ill. App. 3d at 706.

¶ 78        V Land first claims that Lobo was not entitled to monetary damages because it had not substantially complied with the material terms of the contracts due to its attempt to lower the purchase price. This argument is a mere rehashing of the specific performance claim set forth

above, and we have no need to discuss it further as we have determined that the trial court properly awarded specific performance based on the lower contract prices.

¶ 79        Next, V Land claims that Lobo was not entitled to damages for lost rental income or the loss of the benefit of the § 1031 exchange because such damages were not authorized by the contracts. V Land points to paragraph 16(b) of the contracts, which provides:

> "Should Seller default under this Agreement and provided that Buyer is not in default hereunder, Buyer shall give Seller written notice specifying the nature of the default. If Seller fails to cure such default within thirty (30) days after receipt of such notice, all Earnest Money shall be returned to Buyer, Buyer shall be entitled to its Out-Of-Pocket Expenses, provided the Third Party Reports are delivered to Seller and Buyer shall have the right to sue for specific performance."

V Land thus argues that, under the terms of the contracts, the parties agreed that Lobo would be entitled only to the three remedies set forth in that provision: (1) the return of earnest money, (2) Lobo's out-of-pocket expenses, and (3) a suit for specific performance. The trial court found that the language of this provision did not prohibit Lobo from seeking additional damages. We agree.

¶ 80        The parties' rights under a contract are limited by the terms expressed therein. *O'Shield v. Lakeside Bank*, 335 Ill. App. 3d 834, 839 (2002). Parties may contract for an exclusive remedy under the contract, and "[o]nce made and agreed upon, this remedy provision is binding on the parties and will be recognized and enforced by our courts." *O'Shield*, 335 Ill. App. 3d at 839. Such a remedy provision will be deemed exclusive "if the contract warrants this interpretation," even if the word "exclusive" does not expressly appear within the contract. *O'Shield*, 335 Ill. App. 3d at 839. "However, the contract must clearly indicate that

38

the parties intend that the stipulated remedy be the sole or exclusive remedy." *Lake County Trust Co. v. Two Bar B, Inc.*, 182 Ill. App. 3d 186, 192 (1989).

¶ 81          In the case at bar, nothing in the language of paragraph 16(b) indicates that the remedies set forth in that paragraph are to be the "sole" or "exclusive" remedies available to Lobo. We note that, while those terms do not necessarily need to expressly appear in the contract, such language does appear in the immediately preceding paragraph 16(a), which concerns the buyer's default:

> "Should Buyer default under this Agreement and provided that Seller is not in default hereunder, Seller shall give Buyer written notice specifying the nature of the default. If Buyer fails to cure such default within thirty (30) days after receipt of such written notice, then Buyer shall be obligated within two (2) business days after the thirty (30) day cure period ends to replace the Note in the Escrow with cash and to direct that escrowee pay the Earnest Money to Seller. If Buyer fails to replace the Note with cash, then the Note shall be delivered to Seller and Seller may bring an action to collect the Note. *The Earnest Money shall be Seller's sole and exclusive remedy for Buyer's default.*" (Emphasis added.)

The fact that such a limitation appears in one subparagraph, relating to the buyer's default, but does not appear in the corresponding subparagraph relating to the seller's default, which appears immediately following the first subparagraph, indicates that the parties intended different results in the two situations. See *Taracorp, Inc. v. NL Industries, Inc.*, 73 F.3d 738, 744 (7th Cir. 1996) ("[W]hen parties to the same contract use such different language to address parallel issues ***, it is reasonable to infer that they intend this language to mean different things."). "[W]hen parties agree to and insert language into a contract, it is

presumed that it was done purposefully, so that the language employed is to be given effect. [Citation.]" *Thompson*, 241 Ill. 2d at 442.

¶ 82      Additionally, we are not persuaded by V Land's claim that permitting Lobo to seek damages other than those enumerated in the contracts would render paragraph 16(b) meaningless. Paragraph 16(b) operates to make clear certain categories of damages and other relief that the buyer is automatically entitled to in the event of the seller's breach. This language does not lose its meaning simply because the buyer may also assert other claims for damages within the context of a lawsuit.[4]

¶ 83      Finally, we are unpersuaded by V Land's use of the Latin-term maxim *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another). Under that maxim, the expression of one or more things of a class implies the exclusion of all those not expressed. *West Bend Mutual Insurance Co. v. DJW-Ridgeway Building Consultants, Inc.*, 2015 IL App (2d) 140441, ¶ 38; *Suga v. Suga*, 35 Ill. App. 2d 355, 359 (1962). However, as noted, there is nothing in the language of the provision that indicates that it is intended to be the type of exclusive list to which this maxim applies and, to the contrary, the language of the contracts as a whole leads to the conclusion that it was *not* intended to be an exclusive list in light of the absence of language similar to that included in the preceding subparagraph.

¶ 84      V Land also argues that Lobo was not entitled to damages because it could not both seek specific performance and seek damages for lost business opportunities. As noted, when a

---

[4]We also note that, while not raised by the parties, an argument could be made that the damages awarded by the trial court *were* encompassed by the language of paragraph 16(b), which expressly includes the right to file suit for specific performance. As noted, a grant of specific performance may include an award of damages where the specific performance alone would not make the plaintiff whole. See *Mandel*, 404 Ill. App. 3d at 706.

decree of specific performance does not provide complete relief, "the injured party is entitled to those damages that will make him whole, including monetary damages incidental to and caused by a delay in performance." *Mandel*, 404 Ill. App. 3d at 706.

> "Although such compensation is often referred to by the courts as 'damages,' some authorities suggest that it should more properly be considered as equitable compensation in the nature of an accounting between the parties rather than legal damages, inasmuch as the court in awarding specific performance is confirming the contract and erasing the breach. [Citation.] Under this view, the compensation awarded as incident to a decree for specific performance is not for breach of contract and is therefore not legal damages. [Citation.]" *Douglas Theater Corp. v. Chicago Title & Trust Co.*, 266 Ill. App. 3d 1037, 1043 (1994).

Thus, damages at law, such as for lost business opportunities, are generally not recoverable in a specific performance action. See *Douglas Theater Corp.*, 266 Ill. App. 3d at 1043. For instance, in *Douglas Theater*, which involved a refusal to convey a portion of a building that was to be used as a theater, the appellate court affirmed the denial of incidental damages for loss of the opportunity to build the theater, as well as loss of rent and profits resulting from the loss of the ability to build the theater, finding that these damages were not appropriate in an action for specific performance. *Douglas Theater Corp.*, 266 Ill. App. 3d at 1043-44.

¶ 85    In the case at bar, the monetary damages awarded by the trial court were not the type of damages prohibited in a specific performance action but instead, were intended to make Lobo whole. The trial court awarded damages for the loss of the tax benefits of the § 1031 exchange, as well as for lost rental income, not for the loss of business opportunities that Lobo may have had if the closing had occurred as scheduled. Both of these categories of

41

damages were clearly attributable to the delay in closing and were necessary to make Lobo whole. The entire purpose of structuring the closings in the way the contract provided was to take advantage of the tax benefits of a § 1031 exchange in connection with the sale of the Mokena properties. The contracts for the Mokena properties make specific reference to the purchase contracts at issue in the case at bar and state that those "Exchange Contracts" were "hereby acknowledged by the parties as being interrelated and interdependent with" the Mokena contracts. By not closing on the properties in time, Lobo lost the tax benefits to which it was entitled. Similarly, by not closing on the original closing date, Lobo was deprived of the income stream from the rents paid by Staples and Chase Bank pursuant to their leases on the properties. This is not a situation like the one present in *Douglas Theater Corp.*, where the plaintiff was planning on building theaters on the premises and lost its business opportunities. Instead, this is a case in which there were active leases under which rents were being paid to V Land that would have been paid to Lobo had the properties closed in a timely manner under the contract. Consequently, we find no error in the trial court's award of damages.

¶ 86                                    II. Failure to Close

¶ 87        Given our conclusion that Lobo was entitled to specific performance at the lower purchase price, we next consider V Land's and Lakeside's arguments that Lobo lost that right and terminated the contracts when it failed to close on the court-set March 23, 2017, closing date. On March 17, 2017, the trial court entered a final modified judgment in the instant case, in which it ordered that on March 23, 2017, "in accordance with [the] Purchase and Sale Agreement," V Land was to sell to Lobo the Canal property for the purchase price of $8 million, payable as follows: (1) Lobo was to pay Lakeside $6,110,302.49 on the Canal loan;

42

(2) upon Lakeside's receipt of the payment, Lakeside was to deliver to Lobo a release of the first and second mortgages, including all modifications, held by Lakeside on the Canal property, a release of the assignment of rents on the Canal property, and a UCC termination statement for the security agreement, all in recordable form, and V Land was to deliver to Lobo a special warranty deed to the Canal property in recordable form; and (3) the balance of the purchase price in the amount of $1,889,697.51 was to be abated by application of amounts due from V Land to Lobo.

¶ 88    Additionally, the court ordered that on March 23, 2017, "in accordance with [the] Purchase and Sale Agreement," V Land was to sell to Lobo the Bloomingdale property for the purchase price of $4 million, payable as follows: (1) Lobo was to pay Lakeside $3,041,467.24 on the Bloomingdale loan; (2) upon Lakeside's receipt of the payment, Lakeside was to deliver to Lobo a release of the first and second mortgages, including all modifications, held by Lakeside on the Bloomingdale property, a release of the assignment of rents on the Bloomingdale property, and a UCC termination statement for the security agreement, all in recordable form, and V Land was to deliver to Lobo a special warranty deed to the Bloomingdale property in recordable form; and (3) the balance of the purchase price in the amount of $958,532.76 was to be abated by application of amounts due from V Land to Lobo.

¶ 89    The trial court further ordered that "[s]ubject to the provisions above, the closing of both the above purchase and sale transactions shall be conducted according to the terms of the respective Canal Contract and Bloomingdale Contract (together the 'Contracts'), including without limitation those provisions of the Contracts requiring execution and/or delivery of documents at closing and allocation and/or payment of closing costs, prorations, and credits."

¶ 90    The closing did not occur on March 23. Instead, on that date, Lobo filed an emergency motion to enforce the final modified judgment, in which it claimed that V Land was violating the judgment and the terms of the contracts; the trial court denied Lobo's motion. Both Lakeside and V Land claim that, by not closing, Lobo terminated its rights under the contract. Lobo's claims that V Land violated the contracts, and Lakeside and V Land's claims that Lobo terminated the contracts, all stem from paragraph 5 of the contracts, which provides:

> "*Title Evidence.* Seller shall cause to be delivered to Buyer within fifteen (15) days after the Effective Date (a) a commitment dated on or after the Effective Date (the *'Title Commitment'*) to issue a 1992 ALTA form owner's policy of title insurance in the amount of the Purchase Price with those endorsements set forth below (the *'Title Policy'*) issued by Chicago Title Insurance Company (the *'Title Company'*), and (b) complete, legible copies of all documents relating to title exceptions referenced in the Title Commitment (the *'Title Documents'*). When issued, the Title Policy shall show title to the Property as of the Closing Date in Buyer to be subject only to the Permitted Encumbrances ***.

> The proceeds due Seller at Closing shall be used by the Escrowee to satisfy or otherwise obtain a release of any existing mortgage including Lender's construction mortgage and any other monetary encumbrances arising from acts of Seller to enable the Title Company to delete the encumbrance from the Title Policy.

> Buyer shall have ten (10) business days after receipt of the Title Commitment, Title Documents and the Existing Survey identified on *Exhibit 'D'* to object in writing (an *'Objections Letter'*) to any exceptions reported in the Title Commitment

44

or any matters shown on the Existing Survey (such matters, *'Unpermitted Title and Survey Exceptions'*) and to request additional endorsements to address matters raised by the Title Commitment and Existing Survey. Matters specifically stated in the Title Commitment and not objected to by Buyer in the Objections Letter shall become permitted (*'Permitted Encumbrance'*).

Seller shall have 30 days from the date of the Objections Letter (the 'Cure Period') to have the Unpermitted Title and Survey Exceptions removed from the Title Commitment, to correct the defects noted on the Existing Survey and to obtain a revised Title Commitment. If Seller does not have such exceptions removed, does not correct all survey defects and does not provide Buyer with a revised Title Commitment with the additional endorsements, if any, during the Cure Period, Buyer may elect, by written notice to Seller delivered within five (5) business days after the end of the Cure Period, to (i) terminate this Agreement, in which case the Earnest Money shall be returned to Buyer by Escrowee, the Out-Of-Pocket Expenses (as defined below) shall be reimbursed to Buyer, Buyer shall deliver the Third Party Reports (as defined below) to Seller, and the parties shall have no further rights or obligations hereunder, except for those rights and obligations which expressly survive any such termination, or (ii) waive such objections hereunder and proceed with the transaction pursuant to the remaining terms and conditions of this Agreement. Any objections to title which Buyer waives pursuant to (ii) above shall be deemed Permitted Encumbrances. If Buyer fails to give Seller notice of its election as provided above, it shall be deemed to have elected the option contained in subsection (ii) above. Notwithstanding anything to the contrary contained herein, if any existing

mortgage or other monetary encumbrance is an exception to title and Seller fails to cure or satisfy such defect, then at Closing Buyer shall have the right to direct Escrowee to cause a portion of the Purchase Price to be used to satisfy the same."

¶ 91 In essence, Lobo claims that V Land breached the contracts by not delivering clear title or other documents at closing. V Land and Lakeside claim that Lobo's only options in that case were to waive the unpermitted encumbrances and close or to terminate the contract. Since Lobo clearly did not choose to close, V Land and Lakeside claim it should be deemed to have terminated the contract.

¶ 92 Paragraph 5 of the contracts expressly provides that, "[w]hen issued, the Title Policy shall show title to the Property as of the Closing Date in Buyer to be subject only to the Permitted Encumbrances ***." Lobo claimed in its motion that on March 22, 2017, the day before closing, Chicago Title provided Lobo with a *pro forma* title policy that complied with this paragraph. However, on the day of closing, Chicago Title provided Lobo with a "revised" *pro forma* title policy that added a number of exceptions to the policies, including exceptions for the Lakeside mortgages, the assignment of leases and rents, the "[p]roceeding pending in the Circuit Court of Cook County, Illinois, as [*sic*] case number 05 CH 22194," and the "[t]erms and provisions contained in [the] Memorandum Opinion and Order entered on May 24, 2012" in the instant case. There is no dispute that these exceptions were not "Permitted Encumbrances." Thus, under the terms of the contracts, the title policy provided to Lobo did not comply with the requirements of paragraph 5.[5]

---

[5]We recognize that Lakeside and V Land provided reasons for the exceptions being included on the title policies, namely, Chicago Title's refusal to issue clean title policies while the parties retained appeal rights. However, this is largely irrelevant to the issue of whether the title policy provided by Chicago Title satisfied the terms of paragraph 5.

¶ 93       However, the contracts themselves contained a mechanism for dealing with unpermitted encumbrances on title. Under paragraph 5, the buyer had 10 days after the receipt of the title documents to object to any exceptions; if it did not object, the unobjected-to items on title would become "Permitted Encumbrances." The seller then would have 30 days from the date of the objections letter to correct the defects and obtain a revised title commitment. If the seller failed to correct the issue, "Buyer may elect, by written notice to Seller delivered within five (5) business days after the end of the Cure Period, to (i) terminate this Agreement, *** or (ii) waive such objections hereunder and proceed with the transaction pursuant to the remaining terms and conditions of this Agreement."

¶ 94       Lakeside and V Land focus on the last point, arguing that since Lobo did not waive its objections and close, it must be deemed to have terminated the agreements. The trial court agreed with this position. However, this ruling omits several key steps in the process. According to Lobo, on the day of the closing, it was presented with a new *pro forma* title policy—different than the policy it had previously been provided—that contained a number of new exceptions to which it objected. Under the terms of the contracts, once Chicago Title presented Lobo with an objectionable title policy, Lobo was entitled to object and to demand that V Land remove the objectionable exceptions from title. Only after V Land refused to correct the issue could Lobo be compelled to choose between closing and terminating the agreement. It cannot be the case that a seller can, on the day of the closing, provide a completely new title policy, and require the buyer to immediately close or terminate the agreement. Such a result is not contemplated by the contracts and would be manifestly unjust.

¶ 95    We recognize that this litigation has been pending for a number of years, and the parties wish to resolve it as soon as possible. However, the way to do so is not by skipping over important steps in the process. When Lobo received the new title policy, it should have been permitted to object to the new exceptions on title, and V Land should have had the opportunity to address those objections. Lakeside and V Land claim that the exceptions were included due to Chicago Title's concerns over the parties' appeal rights. The emails attached to their responses to Lobo's emergency motion appear to bear this out, at least to some extent. However, those emails are all dated March 22, 2017—the day before closing— meaning that all decisions and discussions were conducted quickly. One benefit to following the steps set forth in the contracts is that the parties have the time and ability to discuss possible resolution of the issues. If not—if the parties remain in the same position concerning the exceptions—then Lobo must make a choice: close or terminate. However, Lobo should not have been deemed to have made the choice to terminate on March 23, 2017, when it did not close. Instead, the trial court should have set a new closing date, as requested by Lobo in its emergency order. We accordingly reverse the denial of Lobo's emergency motion and remand to the trial court with orders for it to set a new closing date.[6]

¶ 96                                  III. Subrogation

¶ 97    We next turn to the issue of whether Lakeside's mortgages have priority over Lobo's interest in the properties and the extent of that priority. On May 10, 2011, the trial court granted partial summary judgment in Lakeside's favor, finding that, based on conventional subrogation, Lakeside's mortgage on the Bloomingdale property was in first priority position

---

[6]We note that Lobo claims that Lakeside refused to release its mortgages, leading to their presence on title. However, Lakeside attached its releases to its response to the emergency motion, and represented that it was prepared to release the mortgages upon receipt of the payoff amounts.

and its mortgage on the Canal property was in first priority position to the extent of $7,019,713.25. However, on February 25, 2015, the trial court granted summary judgment in favor of Lobo on the issue of the remaining $518,000, finding that Lakeside was not entitled to equitable subrogation of those funds. We consider each order in turn.

¶ 98                         A. Lakeside's Payment of Prior Loans

¶ 99        First, Lobo argues that the trial court erred in granting summary judgment in favor of Lakeside and finding that Lakeside's mortgages were superior to Lobo's interest to the extent that they were used to pay off the prior construction mortgages. The trial court's decision was based on its application of conventional subrogation. "Subrogation is a principle of equity jurisprudence where one who involuntarily pays the debt of another succeeds to the rights of the original creditor, with respect to the debt paid." *Paliatka v. Bush*, 2018 IL App (1st) 172435, ¶ 16. In Illinois, subrogation is often applied to substitute one party to the lien priority of another. *Paliatka*, 2018 IL App (1st) 172435, ¶ 16. There are two types of subrogation recognized under Illinois law: contractual, or conventional, subrogation and common law, or equitable, subrogation. *Paliatka*, 2018 IL App (1st) 172435, ¶ 17. Conventional subrogation, which the trial court applied here, arises where there is an express agreement between the parties to the effect that the party paying the debts on behalf of the third party will be able to assert the rights of the original creditor. *Paliatka*, 2018 IL App (1st) 172435, ¶ 17. "By paying the debt, the subrogee is entitled to the benefit of the security he satisfied with an expectation of receiving equal priority in terms of a lien." *Union Planters Bank, N.A. v. FT Mortgage Cos.*, 341 Ill. App. 3d 921, 925 (2003).

¶ 100       Conventional subrogation may apply in the context of mortgage refinancing up to the amount of the original mortgage, provided that the original mortgage remains in effect at the

time that the refinancing mortgage lien is recorded; if the original mortgage lien is released prior to the recordation of the new mortgage, conventional subrogation does not apply. *Aames Capital Corp. v. Interstate Bank of Oak Forest*, 315 Ill. App. 3d 700, 710 (2000). In addition to the requirement of an express agreement, the lender seeking the benefit of a conventional subrogation must prove that (1) the loan proceeds were used to refinance the mortgage for which the lender seeks to be subrogated, (2) no harm will come to an innocent party if priority is granted to the lender, and (3) there has been no gross negligence. *Union Planters Bank*, 341 Ill. App. 3d at 925.

¶ 101    In the case at bar, Lobo does not claim on appeal that Lakeside's mortgages were not used to pay off the existing construction loans, nor does it dispute that Lakeside did so in agreement with V Land that Lakeside would obtain a first priority lien on each property. Lakeside submitted a number of documents in connection with its motion for summary judgment in support of this agreement. First, in his affidavit, Chris Sotos, chief financial officer for V Land, averred that he spoke with David Pinkerton of Lakeside concerning the mortgages and offered to give Lakeside first priority mortgage liens on both the Canal and Bloomingdale properties in exchange for the Lakeside loans, and further averred that Lakeside issued the loans on those terms and that the funds were in fact used to pay off the construction loans. Similarly, in his affidavit, Pinkerton averred that Lakeside approved the loans on the condition that Lakeside receive first priority mortgage liens on both properties. Pinkerton also averred to the accuracy of internal loan proposals and loan committee minutes that stated that the loans would be in first priority position; these documents were also attached to the motion for summary judgment.

¶ 102     Instead, Lobo claims that the doctrine of equitable conversion meant that Lobo was the equitable owner of the property at the time of the Lakeside mortgages, and Lakeside was fully aware of Lobo's interest at the time it made its loans. Accordingly, Lobo claims that conventional subrogation does not apply and its interests were superior to Lakeside's. In essence, Lobo claims that its rights under equitable conversion trump Lakeside's rights under conventional subrogation.

¶ 103     Under the doctrine of equitable conversion, "when the owner of land enters into a valid and enforceable contract for its sale he continues to hold the legal title, but in trust for the buyer; and the buyer becomes the equitable owner and holds the purchase money in trust for the seller." *Shay v. Penrose*, 25 Ill. 2d 447, 449 (1962). This "conversion" takes place at the time of entering into the contract. *Shay*, 25 Ill. 2d at 449. In the case at bar, Lobo and V Land executed their purchase contracts on June 30, 2005, and thus, as of that date, Lobo became the equitable owner of the properties, and V Land owned only a personal property interest in the purchase money. See *United Community Bank v. Prairie State Bank & Trust*, 2012 IL App (4th) 110973, ¶ 35.

¶ 104     Furthermore, equitable conversion is effective as to those with notice of the contract "[i]nsomuch as the vendor's heirs, devisees, and grantees have 'notice' of the executory contract, it binds them, and as far as they are concerned, the vendor no longer has an interest in the land but instead has only a personal-property interest in the purchase money." *United Community Bank*, 2012 IL App (4th) 110973, ¶ 35. Here, there is no dispute that Lakeside was aware of Lobo's purchase contracts at the time it made its loans to V Land; the record shows that Lobo filed notices of *lis pendens* when it filed the instant lawsuit, and Lakeside specifically referred to Lobo's interest in the properties in its internal loan documents.

51

Accordingly, Lakeside would have taken its interest in the properties subject to Lobo's interest.[7] See *Hinsdale Federal Savings & Loan Ass'n v. Gary-Wheaton Bank*, 100 Ill. App. 3d 746, 749 (1981).

¶ 105    However, even though it is clear that Lobo's interest would be superior to Lakeside's if V Land had merely mortgaged the property, the result is less obvious when the existence of the prior construction loans comes into play. Lobo executed its purchase contracts with the express understanding that the properties were under construction. The purchase contracts list, in their recitals, the fact that each property was under construction, and paragraph 7 of the contracts concerned completion of the work and Lobo's options in the case that construction was not completed by the time of closing. Moreover, Lobo was aware that there were construction mortgages on the properties. The recitals specifically state that V Land had obtained a construction loan on the property, and the purchase contracts provide that that the construction mortgages would be released at closing. Thus, it is clear that Lobo's interest in the properties was subject to the prior construction mortgages. The question, then, is whether conventional subrogation can operate to permit Lakeside's mortgages to stand in that same position with respect to Lobo's interest.

¶ 106    Lakeside points to *La Salle Bank, N.I. v. First American Bank*, 316 Ill. App. 3d 515 (2000), claiming that equitable conversion is irrelevant to the determination of whether conventional subrogation should apply. However, we find this case to be of limited usefulness to our analysis because, despite Lakeside's contention to the contrary, *La Salle Bank* is not "indistinguishable" from the instant case but instead presents a significantly different factual scenario. There, the buyer executed a purchase contract with the beneficiary

---

[7]Due to our agreement with Lobo on this issue, we have no need to discuss the effect of the filing of the *lis pendens* notices.

52

of a land trust for the purchase of property. *La Salle Bank*, 316 Ill. App. 3d at 518. After the execution of the contract, the beneficiary and trustee of the land trust entered into a construction loan for the property that was secured by a mortgage, which the bank later sought to foreclose. *La Salle Bank*, 316 Ill. App. 3d at 518-19. The bank argued that it was entitled to first priority over the buyer's interest in the property because when it issued its loan, it had paid off a prior mortgage on the property in return for a first priority lien. *La Salle Bank*, 316 Ill. App. 3d at 521. The buyer, in turn, argued that equitable conversion meant that its interest was superior to the bank's. *La Salle Bank*, 316 Ill. App. 3d at 521. On appeal, we first considered the conventional subrogation issue, as that was the basis for the trial court's grant of summary judgment in the bank's favor, and found that the trial court properly concluded that the bank's loan was entitled to subrogation. *La Salle Bank*, 316 Ill. App. 3d at 523. We then turned to the buyer's equitable conversion argument and determined that the doctrine did not apply because the beneficiary of the land trust, with whom the buyer had contracted, "was not at any time the legal or equitable owner of the property and thus had no ownership interest to convey." *La Salle Bank*, 316 Ill. App. 3d at 524.

¶ 107    The facts in *La Salle Bank* are clearly distinguishable from the case at bar, and the case is of limited usefulness to our analysis as a result. In that case, as noted, the doctrine of equitable conversion was not implicated because the buyer had not contracted with the legal or equitable owner of the property. Here, by contrast, V Land was the legal and equitable owner of the property and, therefore, when it contracted with Lobo, Lobo took equitable ownership through equitable conversion at the time of the contract's execution. Accordingly, we cannot find that the holding in *La Salle Bank* impacts our decision in any regard.

53

¶ 108     We are left, then, with the question of whether a mortgage[8] issued after the execution of a purchase contract may, through conventional subrogation, take priority over the purchaser's interests if such a mortgage was used to pay off a prior mortgage that existed prior to the execution of the purchase contract. We find that it can, provided that all of the elements of conventional subrogation are satisfied. Both conventional subrogation and equitable conversion are equitable doctrines. See *United Community Bank*, 2012 IL App (4th) 110973, ¶ 35 (describing equitable conversion as "an application of a general principle of equity: 'equity regards and treats as done what ought to be done' " (quoting 1 John N. Pomeroy, A Treatise on Equity Jurisprudence § 368, at 685 (4th ed. 1918))); *Dix Mutual Insurance Co. v. LaFramboise*, 149 Ill. 2d 314, 319 (1992) ("The right of subrogation is an equitable right and remedy which rests on the principle that substantial justice should be attained by placing ultimate responsibility for the loss upon the one against whom in good conscience it ought to fall."); *Home Savings Bank v. Bierstadt*, 168 Ill. 618, 624 (1897) (conventional subrogation "results from an equitable right springing from an express agreement with the debtor, by which one advances money to pay a claim for the security of which there exists a lien, by which agreement he is to have an equal lien to that paid off"). Here, then, equity compels the result: if Lobo executed its purchase agreements subject to the existence of mortgages on the properties, then it is irrelevant whether those mortgages are held by the original lenders or by Lakeside, provided that the other elements of conventional subrogation have been satisfied.

¶ 109     We turn, then to the question of whether the trial court properly concluded that Lakeside had established the elements of conventional subrogation. Again, in addition to the requirement of an express agreement, the lender seeking the benefit of a conventional

---

[8]Despite Lakeside's argument to the contrary, we do not read Lobo's argument as arguing that the Lakeside mortgages are invalid but simply that they are inferior to Lobo's interest.

subrogation must prove that (1) the loan proceeds were used to refinance the mortgage for which the lender seeks to be subrogated, (2) no harm will come to an innocent party if priority is granted to the lender, and (3) there has been no gross negligence. *Union Planters Bank*, 341 Ill. App. 3d at 925. We agree with the trial court that all of these elements have been satisfied.

¶ 110    As noted, Lobo does not dispute that Lakeside and V Land agreed that Lakeside would pay off the prior construction loans on the properties in exchange for a first priority lien on the properties and Lakeside provided evidence that such an agreement existed, which we set forth above. Lobo's only argument as to this point is its argument that there was no "agreement" because Lobo, not V Land, was the equitable owner of the properties. However, we do not find this argument persuasive. The "debtor" at issue was V Land, not Lobo, and it was V Land's debt that was being paid. Thus, an agreement between V Land and Lakeside was all that was required. We also find unpersuasive Lobo's argument that V Land and Lakeside could not enter into any agreement due to the purchase contracts' provisions that "Seller shall not cause, agree to or willfully or intentionally permit any encumbrance, easement, covenant or restriction of, or otherwise grant any interest in, the Property or any part thereof in any form or manner whatsoever" and that "Seller agrees not to further alter or encumber in any way [or] change Seller's title to the Property after the date of this Agreement without Buyer's prior written consent." In the case at bar, however, Lakeside's mortgages did not further encumber the properties but, in essence, simply exchanged one lienholder for another, since Lakeside's mortgages were executed in conjunction with the releases of the prior mortgages.

¶ 111    Lobo also argues that it would be harmed by permitting Lakeside priority over Lobo's interests. We find this argument unpersuasive in light of our analysis above. As noted, Lobo knew when it executed the purchase agreements that the properties were subject to mortgages to finance the construction on the properties. Lobo fully expected that mortgages would need to be satisfied at the time of closing. We agree with the trial court that no harm comes to Lobo by the holder of those mortgages being Lakeside, rather than the original lenders.

¶ 112    Finally, we cannot agree with Lobo that Lakeside's "gross negligence" bars its use of conventional subrogation. Lobo argues that Lakeside's conduct in knowingly issuing the mortgages, despite knowing of Lobo's interest in the properties and the terms of the purchase agreements, demonstrates gross negligence. However, Lobo does not provide any authority for the proposition that such conduct, even if risky on Lakeside's part, would rise to the level of gross negligence. Accordingly, we cannot find that the trial court erred in granting Lakeside's mortgages first priority to the extent they were used to pay off the original construction mortgages.

¶ 113    Furthermore, even in the absence of conventional subrogation, Lakeside would have been entitled to priority under the doctrine of equitable subrogation. "Equitable subrogation is a creature of chancery that is utilized to prevent unjust enrichment." *Aames Capital*, 315 Ill. App. 3d at 706. "The application of the doctrine of equitable subrogation does not depend upon any set of circumstances but depends upon the equities of each individual case." *Union Planters Bank*, 341 Ill. App. 3d at 925.

¶ 114    In the case at bar, the equities favor granting Lakeside priority over Lobo's interest in the properties such that equitable subrogation would be applicable. Lakeside paid the construction mortgages, thereby paying off mortgages that otherwise would have been paid

at closing. It did so under the understanding that it would be obtaining a first priority lien on the properties. Permitting Lobo to take title to the property without taking into account Lakeside's removal of the prior liens would result in unjust enrichment to Lobo and/or V Land. Accordingly, under either theory, Lakeside would be entitled to subrogation.

¶ 115                                B. Lakeside's Payment of Contractors

¶ 116        Lakeside argues that, in addition to the amounts it loaned to pay off the construction mortgages, it should also have been entitled to subrogation with respect to $518,464.06 that was used to pay contractors. Lakeside's argument is based on the doctrine of equitable subrogation. As noted, "[e]quitable subrogation is a creature of chancery that is utilized to prevent unjust enrichment." *Aames Capital*, 315 Ill. App. 3d at 706. "The application of the doctrine of equitable subrogation does not depend upon any set of circumstances but depends upon the equities of each individual case." *Union Planters Bank*, 341 Ill. App. 3d at 925.

¶ 117        In the case at bar, the trial court granted summary judgment in Lobo's favor on this issue, finding that Lakeside was not entitled to equitable subrogation with respect to these funds. The trial court found that the contractors and subcontractors who had contracted with V Land prior to the purchase contract established mechanics' liens on the properties at the time of contract for services. However, the court further found that all of the contractors and subcontractors, with the exception of one, had executed waivers of their rights to mechanics' liens prior to the time that Lakeside paid them. With respect to the one contractor that had not released its lien prior to Lakeside's payment, the trial court found that the mechanics' lien had not been perfected within four months after completion of the work. Accordingly, the trial court found that Lobo's interest was superior to Lakeside's interest with respect to the funds that Lakeside had paid for the contractors. We can find no error with this analysis.

¶ 118    It is well settled that a subrogee can have no greater right than the subrogor and can enforce only such rights as a subrogor could enforce. *William Aupperle & Sons, Inc. v. American Indemnity Co.*, 75 Ill. App. 3d 722, 724 (1979). Here, almost all of the contractors had waived their rights to mechanics' liens prior to Lakeside's payment. Thus, we find no basis for finding that Lakeside could assert a lien with respect to these payments that would be superior to Lobo's interest in the properties. See *William Aupperle & Sons*, 75 Ill. App. 3d at 724 ("Since we have previously determined that the subrogor has waived its right to a mechanic's lien, it follows that the subrogee's rights in that regard are likewise waived.").

¶ 119    Similarly, we find no error in the court's conclusion that, with respect to the mechanics' lien that had not been waived, Lakeside was not entitled to subrogation because the lien was not perfected as required by section 7 of the Mechanics Lien Act (770 ILCS 60/7 (West 2004)). Lakeside claims that this result conflicts with the result in *Detroit Steel Products Co. v. Hudes*, 17 Ill. App. 2d 514 (1958), in which Lakeside claims that the court "granted equitable subrogation to the mortgage lender without any showing that the materialmen's liens had been perfected." However, we do not agree with Lakeside that the lack of a discussion over whether the liens were perfected means that the lender was not required to establish this fact—it simply means that it was not at issue in the case and we can read nothing more into its absence. Indeed, the *Detroit Steel* court did, when finding that a mechanic's lien had priority over a subsequent mortgage, note that such a lien would need to be "properly perfected in accordance with the statute." *Detroit Steel*, 17 Ill. App. 2d at 519. There is thus no indication that *Detroit Steel* can be read to stand for the proposition that an unperfected mechanic's lien may be the basis of a subrogation claim. Here, where there was no valid mechanic's lien because it was never perfected, we can find no error in the trial

court's finding that Lakeside was not entitled to equitable subrogation based on its payment of this claim.

¶ 120                                    C. Other Payments by Lakeside

¶ 121          Finally, Lakeside claims that the trial court erred in denying Lakeside's motion to modify the order to include two additional subrogations with respect to the Canal loan. Specifically, on October 11, 2016, after the trial court had entered an order setting forth the formula for determining the payoff amounts, Lakeside filed a motion to modify the order, claiming that it was entitled to equitable subrogation of amounts that Lakeside had advanced to pay property taxes and amounts on the Canal loan that had been used to pay off the Bloomingdale construction loan. The trial court denied Lakeside's motion, finding that "[t]hese issues have already been addressed from this court's perspective." When asked if there was any further reasoning for its ruling, the court explained that "from my perspective the motion really is just getting at issues that already have been, at least from my perspective, addressed and [is] not appropriate at this time." Lakeside argues that the specific amounts listed in the motion had not been previously addressed and that the trial court should have therefore considered the issues and granted its motion.

¶ 122          "A motion to reconsider based on the submission of new matters, such as new arguments or legal theories not presented during the pendency of the original motion for summary judgment, is reviewed under an abuse-of-discretion standard." *Daniels v. Corrigan*, 382 Ill. App. 3d 66, 71 (2008). In the case at bar, we cannot find that the trial court abused its discretion in denying Lakeside's motion. In its motion to modify the order, Lakeside pointed to $78,204.08 that was allegedly used to pay property taxes and to $70,391.71 from the Canal loan that was used to pay part of the construction mortgage on the Bloomingdale property.

Lakeside claimed that the trial court had never made an "express ruling" as to whether these amounts were entitled to subrogation.

¶ 123    However, the amount of Lakeside's priority had been extensively litigated throughout the case, culminating in the trial court's order setting the calculation for the final payoff amounts, which was the order Lakeside sought to modify. While the trial court's order could have been clearer in terms of explaining its reasoning, the trial court did expressly find in that order that only $7,019,713.29 of the Canal loan was entitled to subrogation and $1,079,573.86 was not. We thus cannot find the trial court abused its discretion in finding that Lakeside's attempts to argue over specific amounts that it contended should be subrogated was merely another attempt to relitigate something that had already been decided. To the extent that Lakeside argues that it only became aware of the amounts that would be subrogated when the trial court entered its order setting forth the formula, we note that the trial court had consistently held since its May 10, 2011, order that $7,019,713.29 of the Canal loan was subrogated, so Lakeside was fully able to determine what arguments it wished to raise with respect to the remainder of the loan at any time.

¶ 124                                    IV. Abatement

¶ 125    The final major issue we must resolve in the instant case is whether the portions of the Canal and Bloomingdale loans that had priority over Lobo's interests were subject to payment by Lobo and, if so, in what amounts. In the case at bar, the trial court found that Lobo was entitled to abate[9] the purchase price against V Land, offsetting the amount it was

---

[9]We note the term "abatement" has been used in various ways in relation to a grant of specific performance. One use of the term is in the situation where "specific performance of a contract for the sale of real estate will be ordered, at the election of the purchaser, even though the vendor may be unable to convey all of the property included in the contract, with an abatement of the purchase price for slight defects in quantity and quality of the estate." *Schiro v. W.E. Gould & Co.*, 18 Ill. 2d 538, 542 (1960). Another is in the nature of an offset, where the purchase price is decreased because of

required to pay by the amount of damages awarded by the trial court as a result of V Land's breach. This approach has been approved by our courts in the past. For instance, in *Industrial Steel Construction, Inc. v. Mooncotch*, 264 Ill. App. 3d 507, 512 (1994), we affirmed the trial court's abatement of the purchase price on an option to purchase certain property by deducting the rent that had been paid by the purchaser-tenant after it became the equitable owner of the property. We found that "the trial court's abatement of rents was not meant to punish defendants." *Industrial Steel Construction*, 264 Ill. App. 3d at 512. Instead, we noted that, in an action for specific performance, a court may also award monetary damages that will make the plaintiff whole and found that the credit for the rents "was an equitable adjustment made by the trial court in light of plaintiff's equitable ownership, as well as the delay by defendants, and not damages." *Industrial Steel Construction*, 264 Ill. App. 3d at 512-13. In the case at bar, on appeal, no party appears to take issue with the proposition that the trial court was permitted to abate the amount Lobo was required to pay for the properties by at least a portion of the damages awarded to Lobo as a result of V Land's delay in performance.[10] However, the question is the extent of that abatement. The trial court found that this abatement was only to the extent of Lakeside's priority mortgages and that Lobo was required to fully pay the mortgages at closing, while Lobo argues that it should be entitled to subtract the full amount of its damages award from the purchase price. We agree with Lobo.

---

amounts owing to the purchaser; in this case, the abatement is "an equitable adjustment made by the trial court in light of plaintiff's equitable ownership, as well as the delay by defendants, and not damages." *Industrial Steel Construction, Inc. v. Mooncotch*, 264 Ill. App. 3d 507, 512-13 (1994). We read Lobo's argument as requesting abatement in the latter sense (as an offset) and not in the former sense (as compensating for a defect in the property).

[10]At oral argument, V Land's counsel suggested that V Land did not agree with abatement, but the reasoning was merely a rehashing of V Land's arguments as to why Lobo was not entitled to any damages at all.

61

¶ 126    To be clear, as we have found earlier in our analysis, Lakeside has a first priority lien on both properties, meaning that Lakeside must be paid in order for the mortgages to be released. See 765 ILCS 905/2 (West 2004) (after having received full satisfaction and payment of all sums due, a mortgagee shall release the mortgage upon request of the mortgagor). Our analysis on the issue of abatement has no effect on that conclusion. The question we must consider is *who* is responsible for paying Lakeside's mortgages—Lobo or V Land? By finding abatement only to the extent of Lakeside's priority mortgages, the trial court effectively found that Lobo was required to pay Lakeside's mortgages. However, Lakeside has not provided any authority for the proposition that it is Lobo and not V Land that must pay the mortgages.

¶ 127    There is no dispute that the Lakeside mortgages were between Lakeside and V Land, as the seller. Both the note and mortgage for each property list V Land as the "[b]orrower" or "mortgagor" and were executed by Panko on behalf of V Land. Additionally, as has been made abundantly clear during this lengthy litigation, Lobo is not a party to these mortgages in any way and, in fact, vehemently objects to their existence, pointing to the provisions in the contracts providing that "Seller shall not cause, agree to or willfully or intentionally permit any encumbrance, easement, covenant or restriction of, or otherwise grant any interest in, the Property or any part thereof in any form or manner whatsoever" and that "Seller agrees not to further alter or encumber in any way [or] change Seller's title to the Property after the date of this Agreement without Buyer's prior written consent." In short, there can be no dispute that these mortgages are V Land's obligations. This result is not changed by our conclusion above that Lakeside's mortgages have priority over Lobo's interest in the property. Lobo, in executing its purchase contracts, did so subject to the construction

62

mortgages, in whose shoes Lakeside stands in terms of priority. However, executing a contract that is subject to an indebtedness does not obligate Lobo to pay that indebtedness unless it has agreed to do so. *Charter Bank v. Eckert*, 223 Ill. App. 3d 918, 928 (1992) ("Generally, the law provides that when a person takes property 'subject to' an indebtedness, he does not have a personal obligation to pay the indebtedness or to indemnify the grantor against the payment of the indebtedness unless he has expressly agreed to do so."); *Pollard v. Waggoner*, 165 Ill. App. 3d 501, 505 (1988) ("even though a person takes land 'subject to' an indebtedness, he does not have a personal obligation to pay the indebtedness or to indemnify his grantor against the payment of the indebtedness unless he has expressly agreed to do so"); *Pearce v. Desper*, 11 Ill. 2d 569, 575 (1957) ("The words 'subject to' do not indicate an understanding that the mortgage was to be assumed."). Here, nothing in the language of the contracts indicates that Lobo agreed to pay any indebtedness, whether it was the construction mortgages or any new indebtedness.

¶ 128    We note that, with respect to mortgages or other encumbrances, paragraph 5 of the contracts provides:

> "The proceeds due Seller at Closing shall be used by the Escrowee to satisfy or otherwise obtain a release of any existing mortgage including Lender's construction mortgage and any other monetary encumbrances arising from acts of Seller to enable the Title Company to delete the encumbrance from the Title Policy."

Under this provision, there can be no dispute that whatever payment is made to V Land at the closing is required to be used to pay the Lakeside mortgages.

¶ 129    The problem is that the trial court determined that the "proceeds due Seller at Closing" consisted of $6,110,302.49 for the Canal loan and $3,041,467.24 for the Bloomingdale loan,

based on the payoff amounts for the Lakeside mortgages. However, we find no support for this calculation in the purchase contracts. As noted, the mortgages were V Land's mortgages, not Lobo's, and V Land bore the responsibility of paying them at closing. Yes, the purchase price of the properties would have been used to first pay off those mortgages. However, if the purchase price was less than the payoff amounts, V Land would have been required to make up the difference. Under the contracts, V Land was obligated to provide "title to the Property as of the Closing Date in Buyer subject only to the Permitted Encumbrances." Additionally, at closing, V Land was required to provide the title company with "[p]ayoff letters for all of Seller's mortgages, liens and judgments." Thus, it was V Land's obligation to secure the releases of its obligations. We see no reason why this basic proposition should change merely because the "purchase price" is offset by the amount of damages owed by the seller.

¶ 130     Lobo was required to pay V Land $8 million for the Canal property and $4 million for the Bloomingdale property, for a combined purchase price of $12 million. However, V Land was required to pay $6,367,650 in damages to Lobo as a consequence of its delay in performance of the contract. Thus, subtracting the damages award from the aggregate purchase price, Lobo was required to pay $5,632,350 for the two properties. This $5,632,350 would be applied to paying the Lakeside mortgages, but the remaining $3,519,419.73 would be V Land's responsibility. There is no reason why Lobo should be required to pay this amount, and the trial court erred in finding that it was. Under the law, the mortgages are V Land's responsibility as the debtor, and we find no basis under the law to force Lobo to pay them in the way ordered by the trial court. Consequently, at closing, V Land has the obligation to demonstrate that these mortgages will be released or Lobo has the option of terminating the contracts entirely or taking the properties subject to Lakeside's mortgages.

¶ 131     We note that our analysis of the abatement issue is narrower than Lobo would like; under Lobo's theory, it would be entitled to abate the entire damages award against the purchase price *and* receive clear title to the property. This we cannot agree with. As noted, we have determined that Lakeside's mortgages have first priority. Accordingly, they must be paid before Lobo may receive clear title. We agree that it is V Land who must make the payment, not Lobo. But we cannot agree that Lobo should be permitted to receive the benefit of abatement while also taking title free of Lakeside's mortgages.

¶ 132     This result also comports with the equities of the situation. As noted, Lakeside's priority is the result of the application of conventional subrogation, which is an equitable doctrine. *LaFramboise*, 149 Ill. 2d at 319 ("The right of subrogation is an equitable right and remedy which rests on the principle that substantial justice should be attained by placing ultimate responsibility for the loss upon the one against whom in good conscience it ought to fall."); *Bierstadt*, 168 Ill. at 624 (conventional subrogation "results from an equitable right springing from an express agreement with the debtor, by which one advances money to pay a claim for the security of which there exists a lien, by which agreement he is to have an equal lien to that paid off"). In the case at bar, there is no dispute that Lakeside issued its mortgages on the properties in the full knowledge that Lobo had entered into purchase contracts with respect to each of the properties and that Lobo was actively litigating the purchase prices of those contracts. There can also be no dispute that Lakeside was aware of the possibility that the purchase price of each property, combined with damages and attorney fees, could be less than the amount of its mortgages; in its loan proposal, which Lakeside attached to its motion for summary judgment, Pinkerton expressly noted:

65

"The suit asks for specific performance to sell the properties for $8 and $4 million, to get attorney's fees and to get consequential damages relating to the loss of starker exchange benefits which they claim are about $1,000,000. ***

This will probably be fought out in court for a long time. The downside to the bank would be that Vland would have to sell the properties for a total of $12,000,000 in relation to our loan of $11,500,000. So we have some cushion there. They may have to pay some legal fees which could be covered by our cushion so the only wildcard would be the starker's perceived losses. Another outcome of the suit could be that Steve [Panko] gives them back the Mokena property and the existing property remains with us.

One of the conditions of this loan will be that Chicago Title Insurance provide Lakeside Bank with a title policy endorsing/insuring over the Lis Pendens suit against the two properties. Linda Kent has confirmed that they will be willing to do so. This, again, minimizes our down side risk.

In sum, we have two good properties with credit quality tenants. We have a borrower who has been a proven winner in retail real estate and supports the bank with huge deposits. While there will be litigation involved in the property, Lakeside Bank will have a title policy insuring its interest in the property. I think this is a loan we should make."

¶ 133    Additionally, in the loan proposal, Pinkerton identified three sources of repayment, only one of which was the sale of the properties:

"The primary source of repayment will come from the cash flows of the property by way of the rental income. Secondary sources include probable sale of property to

66

contract purchaser. Tertiary sources include outside income from guarantor and sales of other assets."

¶ 134    Thus, it is clear that Lakeside issued its mortgages knowing that there was a risk that the sale of the properties would not cover the amount of its mortgages and took steps to consider how its lien would nevertheless be paid. By contrast, Lobo had no say in the issuance of the mortgages and did not agree to assume them or to repay them in any way; the only involvement it had with any indebtedness was the fact that the proceeds of the sale would be used to pay off V Land's prior mortgages. Additionally, Lobo would have no reason to fear any later indebtedness on the properties, since the purchase contracts specifically required Lobo's consent in such a situation. While we determined that the equities favored Lakeside with respect to Lakeside's mortgage priority, we must conclude that equitable considerations favor Lobo on the question of whether Lobo must be forced to essentially pay off Lakeside's mortgages. As noted, the mortgages were V Land's responsibility, not Lobo's. Accordingly, there was no reason for the trial court to refuse to set off the entire damages award against the purchase price, especially in a situation where Lobo would otherwise be unable to collect its judgment against V Land, as it claims is the case. Again, these mortgages must be paid in order for them to be released. But it is V Land who must make the payment. If it cannot do so, Lobo may terminate the contract or may take the properties subject to those mortgages.

¶ 135                                    V. Remaining Issues

¶ 136    Finally, we must address several remaining issues that have not yet been addressed. First, Lobo claims that the trial court erred in not awarding Lobo $511,763 of attorney fees and costs that arose from the litigation between Lobo and Lakeside. A trial court has broad discretion in awarding attorney fees, and its decision will not be reversed unless the court

67

abused its discretion. *3432 West Henderson Building, LLC v. Gizynski*, 2017 IL App (1st) 160588, ¶ 40. Additionally, "[t]he trial court's determination as to an appropriate award of attorney fees must be considered in light of the principle that the trial judge is permitted to use his own knowledge and experience to assess the time required to complete particular activities, and a court of review may not reverse an award of attorney fees merely because it may have reached a different conclusion." *Chicago Title & Trust Co. v. Chicago Title & Trust Co.*, 248 Ill. App. 3d 1065, 1074 (1993).

¶ 137    Under the purchase contracts, "[i]n the event of litigation arising out of this Agreement, the prevailing party shall be entitled to court costs, out-of-pocket expenses and reasonable attorneys' fees from the unsuccessful party." In the case at bar, we cannot find that the trial court abused its discretion in finding that Lobo was not entitled to its attorney fees with respect to the litigation over the priority of the Lakeside mortgages. The trial court provided two reasons for its decision: that the litigation did not "arise[e] out of" the contracts and that Lobo was not the "prevailing party" with respect to these issues. We agree with the trial court that Lobo was not the "prevailing party" in the priority determination.

¶ 138    A " 'prevailing party, for purposes of awarding attorney fees, is one that is successful on a significant issue and achieves some benefit in bringing suit.' " *Peleton, Inc. v. McGivern's, Inc.*, 375 Ill. App. 3d 222, 227 (2007) (quoting *J.B. Esker & Sons, Inc. v. Cle-Pa's Partnership*, 325 Ill. App. 3d 276, 280 (2001)). Here, the issue was whether Lakeside's loans had priority, and the trial court found that they did. Thus, Lobo was not the prevailing party on that issue. Moreover, to the extent that neither party received all the relief it sought, courts have found that " 'when the dispute involves multiple claims and both parties have won and lost on different claims, it may be inappropriate to find that either party is the prevailing

68

party.' " *Peleton*, 375 Ill. App. 3d 227-28 (quoting *Powers v. Rockford Stop-N-Go, Inc.*, 326 Ill. App. 3d 511, 515 (2001)). Thus, even if Lakeside would not be considered the prevailing party, neither would Lobo. Accordingly, we find no error in the trial court's denial of attorney fees as to these matters.

¶ 139    Similarly, we find no error with the trial court's denial of Lobo's request to update the damages award. As noted, when a decree of specific performance does not provide complete relief, "the injured party is entitled to those damages that will make him whole, including monetary damages incidental to and caused by a delay in performance." *Mandel*, 404 Ill. App. 3d at 706. Thus, as we found above, the trial court properly awarded Lobo damages incurred by V Land's delay. However, we cannot find that these damages should have continued accruing beyond the date in which the trial court entered its order granting specific performance. At that point, the issues between V Land and Lobo were resolved, and it was not V Land's delay that was causing Lobo to incur any damages; if anything, it was the delay incurred by litigating the Lakeside issues. As we explained in our analysis above, the award of damages in a specific performance action is not of the same nature as in a typical breach of contract case but is, instead, a method of repairing the breach and placing the parties in the same position they would be in had the breach not occurred. The additional damages requested by Lobo, however, which were incurred after the issues between Lobo and V Land, would be more typical of the damages at law that are generally not recoverable in a specific performance action. See *Douglas Theater Corp.*, 266 Ill. App. 3d at 1043. Accordingly, we find no error in the trial court's denial of Lobo's motion to update the damages award.

¶ 140    Finally, Lobo claims that the trial court erred in denying its motion for a receiver or to escrow the proceeds from the properties. Lobo claims that the trial court's refusal to do so

69

caused the dissipation of millions of dollars. However, even if the income from the property was not used in the way that Lobo wished—namely, to pay down the loans on the properties—the trial court found that Lobo had not pointed to any authority requiring the funds to be used in this way, and we agree with this conclusion. Lobo also claims that the trial court could have used its statutory authority to escrow the funds pursuant to statutes permitting such action in the face of fraudulent activity. However, again, there has been no finding that any behavior by V Land or Lakeside rose to this level. Accordingly, we cannot find that the trial court abused its discretion by denying Lobo's requested relief.

¶ 141                                              CONCLUSION

¶ 142        For the reasons set forth above, we find the following. First, Lobo was entitled to specific performance of the contracts at the lowered purchase price and was also entitled to damages caused by V Land's delay in performing. Second, Lobo did not terminate this right by failing to close on the court-set closing date, where it was presented with an objectionable *pro forma* title policy on the day of the closing. Third, despite Lobo's position as equitable owner of the properties, Lakeside's mortgages had priority over Lobo's interest based on the doctrine of conventional subrogation. Fourth, the extent of Lakeside's subrogation was limited to the amounts of the construction loans. Fifth, the responsibility for paying off the loans lies with V Land, not Lobo, and thus, the purchase price should have been abated to the full extent of Lobo's judgment against V Land. Sixth, the trial court did not abuse its discretion in denying Lobo's requests for additional attorney fees, an update of the damages award, or the appointment of a receiver.

¶ 143    The case is remanded to the trial court for further proceedings consistent with this opinion, including the setting of a new closing date.

¶ 144    Affirmed in part and reversed in part.

¶ 145    Cause remanded.